*In re* CHMURA

Docket No. 112062. Argued November 10, 1999 (Calendar No. 11). Decided March 28, 2000.

The Judicial Tenure Commission filed a complaint against The Honorable John M. Chmura, judge of the 37th District Court, alleging that certain of his campaign literature violated Canon 7(B)(1)(d) of the Code of ·Judicial Conduct. The Supreme Court appointed former Wayne Circuit Judge John P. Kirwan to serve as master. After conducting an evidentiary hearing, Judge Kirwan reported that the complaint should be dismissed because Canon 7(B)(1)(d) is facially unconstitutional. After both the respondent and the examiner objected to the master's report, the commission, following a hearing, found judicial misconduct and recommended that the Supreme Court suspend the respondent for ninety days. It concluded that Canon 7(B)(1)(d) is not overbroad, reasoning that it applies only when a judicial candidate knows that a communication is false, fraudulent, misleading, or deceptive, and that the misrepresentation is material. The respondent seeks rejection of the commission's recommendation.

In a unanimous opinion by Justice CORRIGAN, the Supreme Court *held*:

Canon 7(B)(1)(d) is facially unconstitutional, requiring a narrowing of the canon to apply only to public communications that a candidate for judicial office knows are false or are used by the candidate with reckless disregard for their truth or falsity. The determination whether a candidate recklessly disregarded the truth or falsity of a public communication involves an objective inquiry.

1. Canon 7(B)(1)(d) is facially unconstitutional because it is not narrowly tailored to serve the state's compelling interest in maintaining the integrity of the election process and ensuring public confidence in the judiciary. The state's interest in preserving public confidence in the judiciary does not support the sweeping restraints imposed by Canon 7(B)(1)(d). The prohibition on misleading and deceptive statements quells the exchange of ideas because the safest response to the risk of disciplinary action may sometimes be to remain silent.

2. Because Canon 7(B)(1)(d) was not intended to extend beyond proper constitutional boundaries, its reach must be limited to known false public communications and false public communica-

tions made with reckless disregard for their truth or falsity. False statements are not protected by the First Amendment in the same manner as truthful statements. By limiting the scope of the canon to known and reckless false public statements, necessary "breathing space" for freedom of expression is provided.

3. The determination whether a candidate recklessly disregarded the truth or falsity of a public communication is objective. The subjective "actual malice" standard employed in defamation cases is inappropriate. Adopting a subjective standard would immunize all accusations, however reckless or irresponsible, from censure as long as the candidate did not actually entertain serious doubts about their truth. The state's interest in protecting the public, the administration of justice, and the legal profession supports applying a different standard in disciplinary proceedings. An objective standard strikes a balance between the candidate's First Amendment rights and the state's interest in preserving confidence in the judicial system.

Remanded.

*Allan D. Sobel* and *Thomas L. Prowse* for Judicial Tenure Commission.

*Collins, Einhorn, Farrell & Ulanoff, P.C.* (by *Brian D. Einhorn, Theresa M. Asoklis,* and *J. Mark Cooney*), for the respondent.

Amicus Curiae:

*Honigman, Miller, Schwartz & Cohn* (by *Herschel P. Fink* and *Dean M. Googasian*) for the American Judicature Society.

CORRIGAN, J. This disciplinary matter involves a challenge to the constitutionality of Canon 7(B)(1)(d) of the Code of Judicial Conduct, which governs public communications by candidates for judicial office.[1] We

---

[1] Canon 7(B)(1)(d) provides that a candidate for judicial office

should not use or participate in the use of any form of public communication that the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or which contains a material misrepresentation of fact or law or omits a fact necessary to make the statement considered as a whole not materially mislead-

hold that Canon 7(B)(1)(d) is facially unconstitutional. We therefore narrow the canon to prohibit a candidate from either knowingly or recklessly using forms of public communication that are false. Accordingly, we amend Canon 7(B)(1)(d) to provide that a candidate for judicial office: "should not knowingly, or with reckless disregard, use or participate in the use of any form of public communication that is false." Because the Judicial Tenure Commission (JTC) did not apply the narrowed canon in its initial decision, we remand to the commission for a determination whether respondent violated the narrowed canon and, if so, for a new recommendation regarding the level of discipline.

### I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

This disciplinary proceeding arises from respondent's 1996 campaign to retain his 37th District Court judgeship against a challenge by James P. Conrad, the 37th District Court administrator and magistrate. Respondent was appointed to the position in May 1996. Conrad ran against respondent in the fall election for the unexpired term.

### A. THE CAMPAIGN LITERATURE

Respondent's campaign committee distributed four fliers that are the subject of these proceedings.[2]

---

ing, or which is likely to create an unjustified expectation about results the candidate can achieve.

[2] The JTC complaint alleged violations involving six fliers, but the JTC ultimately found that exhibits 2 and 6 did not violate Canon 7(B)(1)(d). Although the JTC determination regarding exhibit 2 is troubling because that flier contains statements similar to those in exhibit 1 that the JTC found violated the canon, we do not consider exhibits 2 and 6 because the JTC did not recommend discipline on the basis of those fliers.

Exhibit 1 is a two-page flier entitled "Robin Hood?" The cover portrays former Detroit Mayor Coleman Young as a Robin Hood figure. The left page inside the flier contains a photograph of Mayor Young above the following text: "Coleman Young wanted your money, but one man stood in the way . . . Judge John Chmura." The right page contains a photograph of respondent. The text on that page states that "Coleman Young and the Lansing crowd cooked up a plan to take your tax dollars and spend them on Detroit's school districts. They called it Robin Hood—they stole from our taxpayers, our schools and our children to help prop up Coleman Young." It describes respondent's actions as "standing up to Coleman Young" and "standing up for your children." The text characterizes respondent's role in the lawsuit challenging the statutory scheme as taking "the state to court, arguing one appeal after another, until the state backed down and allowed your kids to benefit from your hard-earned tax dollars." Under the subheading "One Tough Judge," the text relates respondent's involvement in term limits and antitaxation causes before taking the bench. It further states that, as a judge, respondent has conducted himself in accordance with his prior actions by taking "one criminal after another off our streets." The flier then repeats that respondent is "always standing up for what's right." It also reiterates that respondent is "one tough judge." The back page of the flier contains a photograph of respondent with his family and lists his professional and civic affiliations.

Exhibit 3 is a one-page circular, folded in half, entitled "It didn't have to be this way." The cover contains a photograph of a partially obscured police officer in

a patrol car. The inside of the flier contains a depiction of a mug shot with the caption "Murder . . . Rape . . . Dismemberment . . . Innocent Victims . . . Could Jim Conrad's Court have stopped it?" The accompanying text states that James Craig Cristini had appeared at least four times in 37th District Court during Conrad's tenure as court administrator and magistrate and had "received only a slap on the wrist" each time. It states that Cristini was "let back out for only $100" after being charged with assault and battery. The flier further states that "after being released on a second Assault & Battery charge, Cristini went on a rampage of murder and mayhem," resulting in "[i]nnocent victims, raped, murdered and dismembered." The text concludes with the following: "That's what happens when you put bureaucrats in charge of a court. Jim Conrad . . . He's just a bureaucrat." The back of the circular contains the text "End the Fear."

Exhibit 4 is a two-page flier entitled "We shouldn't have to worry about sexual harassment at work or violence at home!" The cover of the flier contains a photograph of a young woman sitting at a typewriter with a male hand touching her shoulder and a photo of a young woman with a young girl. The upper half of the inside of the flier is captioned "Magistrate Jim Conrad is facing trial for sexual harassment of a female court employee!" It includes a photograph of Conrad with a woman identified as a "former court reporter" leaning on his shoulder. The woman's face is obscured. Also included is a reduced image of a pleading described as a "Sexual Harassment complaint filed against Magistrate Jim Conrad." The text states "Conrad tries to dodge trial by claiming 'government immunity.'" It explains in smaller type that

Conrad "is accused of intimidating and firing a female court employee because she complained of being sexually harassed on the job. Papers filed with the court by Conrad's lawyers say that he can't be tried because, as Magistrate, he has governmental immunity!" It further states that the complaint had cost Warren and Center Line taxpayers "thousands of tax $$$ to defend! Now, he wants your vote for District Court judge!"

The bottom half of the inside of the flier is entitled "Judge John Chmura . . . . One Tough Judge" and contains two photographs of him on the bench, one of which shows him exchanging papers with Macomb County Prosecutor Carl Marlinga. The text states "Tough on domestic violence and stalkers!" It explains that respondent is "tough on criminals who prey on women" and "won't stand for acts of domestic violence or allow stalkers to run wild." It further states that respondent "won't tolerate sexual harassment of court employees," explaining that respondent "thinks your peace of mind comes first!" The bottom half of the flier also includes a favorable quote about respondent from Prosecutor Marlinga. The back of the flier contains a photograph of respondent with his family, a list of professional and civic affiliations, and a list of ten endorsers. The text also describes respondent as "one tough judge."

Exhibit 5 is a one-page circular, folded in half, that includes a drawing on its cover of a man leaving a courthouse asking the question "Where is my Courtroom?" The left half of the inside of the flier contains the "answer": "Jim Conrad is not a Judge, he has no courtroom."

The right half of the inside of the flier is captioned "So what has Jim Conrad been doing as Court Administrator for the past 7 years?" The text below the question states "Murderers and Stalkers . . . , back on the streets . . . commit crimes again . . ." It explains: "In case after case . . . Murderer James Craig Cristini . . . Stalker Edward Lightfoot . . . Hardened, violent criminals appeared in the 37th District Court again and again only to be let out to commit more crimes." Under the heading "Corruption and Inefficiency," the flier states that federal investigators were looking into charges that the 37th District Court Probation Department "was running a scam under which court employees were receiving kickbacks, making big money off people's misery."

Under the heading "Sued for Sexual Harassment," the text states that "[w]hen court employee Carrie Meyer complained about the way she was treated at work, Jim Conrad threatened her job, demoted her, and harassed her." It further states that "Conrad's actions have resulted in a major sexual harassment lawsuit which has cost Warren and Center Line thousands to defend. But what's Conrad's defense? That he shouldn't be prosecuted because of government immunity." The text concludes with the statement "That's what happens when you put bureaucrats in charge of a court. Jim Conrad . . . He's just a bureaucrat." The text on the back of the flier states "No More Bureaucrats."

### B. JUDICIAL TENURE COMMISSION PROCEEDINGS

The Judicial Tenure Commission filed a complaint in April 1998 alleging that respondent's campaign literature violated Canon 7(B)(1)(d) of the Code of

Judicial Conduct. This Court appointed former Wayne Circuit Judge John P. Kirwan to serve as master in this case. Judge Kirwan issued a report after conducting an evidentiary hearing.

Judge Kirwan initially determined that the complaint should be dismissed because Canon 7(B)(1)(d) is facially unconstitutional. Judge Kirwan recognized that Michigan has a compelling interest in overseeing and regulating judicial elections. He nevertheless concluded that any canon or rule that attempts to restrict speech must avoid abridging a candidate's right to free speech as defined by *New York Times Co v Sullivan*, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964). Judge Kirwan determined that Canon 7(B)(1)(d) is not sufficiently specific to survive a constitutional challenge because it chills a candidate's right to free speech by not clearly apprising judicial candidates of impermissible comment.

In the alternative, Judge Kirwan assumed the constitutionality of the canon and the applicability of the "actual malice" standard enunciated in *New York Times, supra.* Applying that standard, Judge Kirwan determined the JTC failed to allege or prove actual malice regarding any of the exhibits. He further determined, however, that if the actual malice standard does not apply, the JTC proved that respondent violated Canon 7(B)(1)(d) by distributing exhibits 3 and 5. Judge Kirwan found that "the average intelligent voter would have been misled by the meaning conveyed to the electorate in these exhibits."

After both respondent and the examiner objected to the master's report, the JTC held a hearing. Six JTC members thereafter found judicial misconduct predicated on exhibits 1, 3, 4 and 5. They recommended

that this Court suspend respondent for ninety days for that misconduct. In a separate concurrence, one member joined the recommendation, but observed that judicial elections must be conducted in a dignified way and that candidates must not use false advertising methods. Two members dissented, but did not author separate opinions.

The JTC concluded that Canon 7(B)(1)(d) is not overbroad. It reasoned that the canon is designed to preserve the public's confidence in the judiciary by ensuring that judges do not lie or mislead the public. The JTC determined that a candidate's personal interest in being elected does not override the need for public confidence in the judiciary. The JTC explained that, under *McIntyre v Ohio Elections Comm*, 514 US 334; 115 S Ct 1511; 131 L Ed 2d 426 (1995), the state has leeway to regulate misleading statements made during a campaign. It concluded that the canon is sufficiently precise because it has no impact on truthful communications and does not inhibit candidates from offering opinions. The JTC reasoned that the canon applies only when a judicial candidate knows that a communication is false, fraudulent, misleading or deceptive. The JTC observed that the canon is further limited by the requirement that a misrepresentation be material.

The JTC expressed uncertainty whether the "actual malice" standard of *New York Times*, *supra*, applied to judicial disciplinary matters. It found, however, that in the event that the standard applies, respondent had acted with actual malice. The JTC determined that respondent's "calculated falsehood" satisfied the *New York Times* standard. The JTC explained:

> [W]e are persuaded that Respondent's campaign literature, individually and as a whole, reveals beyond any reasonable doubt a conscious effort to use false, fraudulent, misleading and deceptive statements as part and parcel of his campaign strategy. The materials themselves speak eloquently to this point, as they cover a broad spectrum of issues and are consistently untruthful. Additionally, we note Respondent's own statements about himself as an outsider faced with a hostile environment at the 37th District Court. Respondent had also experienced two unsuccessful bids for non-judicial office. As a result of such considerations, we find that Respondent decided to wage a "brass knuckles" campaign and followed through on that strategy in successfully retaining his judicial position.

Respondent petitions this Court to reject the JTC recommendation.

### II. CANON 7(B)(1)(d)

Canon 7(B)(1)(d) of the Michigan Code of Judicial Conduct provides that a candidate for judicial office,[3] including an incumbent judge,

> should not use or participate in the use of any form of public communication that the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or which contains a material misrepresentation of fact or law or omits a fact necessary to make the statement considered as a whole not materially misleading, or which is likely to create an unjustified expectation about results the candidate can achieve.

We adopted Canon 7(B)(1)(d) and amended other canons in 1995 in response to a proposal by the State

---

[3] Under MRPC 8.2(b), a lawyer who is a candidate for judicial office must comply with the applicable provisions of the Code of Judicial Conduct.

Bar Representative Assembly for a new code of judicial conduct. 449 Mich cxxvii; 442 Mich 1216. Before the amendment, Canon 7(B)(1) contained three precepts that guided a candidate's behavior during the campaign.[4] The source of those provisions is the American Bar Association (ABA) Model Code of Judicial Conduct of 1972, which this Court adopted, with some variations, in 1974. 392 Mich xliii.[5]

---

[4] Canon 7(B)(1) of the Michigan Code of Judicial Conduct of 1974 provided:

A candidate, including an incumbent judge, for a judicial office:

(a) should maintain the dignity appropriate to judicial office, and should encourage members of his family to adhere to the same standards of political conduct that apply to him;

(b) should prohibit public employees subject to his direction or control from doing for him what he is prohibited from doing under this Canon;

(c) should not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; or misrepresent his identity, qualifications, present position, or other fact.

[5] This was not our first attempt to guide the conduct of judges. This Court first promulgated specific rules governing judges over fifty years ago. In 1947, this Court adopted the Canons of Judicial Ethics to set forth principles that would govern the practices of members of the judiciary. See Canons of Judicial Ethics, Preamble. Judicial Canon 4 provided that a judge's "personal behavior, not only upon the bench and in the performance of judicial duties, but also in his everyday life, should be beyond reproach." Judicial Canon 30 concerned a judge maintaining the appearance of impartiality during a campaign for judicial office.

This Court followed a trend toward statements of ethics for judges in adopting the 1947 canons. The ABA had promulgated the Canons of Judicial Ethics some twenty years earlier. The public responded favorably to the ABA canons. See Shepard, *Campaign speech: Restraint and liberty in judicial ethics*, 9 Geo J Legal Ethics 1059, 1063-1065 (1996). Before the 1947 canons, the same ethics rules governed judges and other lawyers in Michigan—the ABA canons of professional ethics. See 1935 Rules Concerning the State Bar of Michigan, § 14, 273 Mich xlii. Our 1947 canons then governed judges' conduct for almost thirty years, until shortly after the ABA promulgated a new model code.

In 1990, the ABA substantially revised the model code. Among other revisions, the ABA replaced the advisory "should" language with declarations regarding what a judge shall not do. Shepard, *Campaign speech: Restraint and liberty in judicial ethics*, 9 Geo J Legal Ethics 1059, 1066 (1996). Canon 5A(3)(d)(iii) of the model code governed a candidate's statements during a campaign for judicial office. It provided that the candidate shall not "knowingly misrepresent the identity, qualifications, present position or any other fact concerning the candidate or an opponent."

The Representative Assembly of the State Bar of Michigan subsequently proposed a new Michigan code of judicial conduct patterned after the 1990 ABA model code. This Court published all but two of their proposed provisions for public comment in 1993. 442 Mich 1216. Among the other revisions, the Representative Assembly proposed a more far-reaching regulation of campaign speech than contained in the 1990 ABA model code. Proposed Canon 5B(3) contained the language this Court incorporated into Canon 7(B)(1) in 1995. *Id.* at 1242-1243. The staff comment to proposed Canon 5B(3) explained: "The standard of accuracy in campaign communications is the same as the standard applied in the Michigan Rules of Professional Conduct for communications concerning a lawyer's services." *Id.* at 1243.

In amending Canon 7(B)(1) in 1995, this Court became one of the few state high courts to adopt broad restrictions on campaign speech by candidates for judicial office.[6] Today, we consider whether

---

[6] Only three other states appear to impose broad restrictions on a candidate's campaign speech. Georgia Code of Judicial Conduct, Canon 7(B)(1)(d) contains the identical language as the Michigan canon, but pro-

Canon 7(B)(1)(d) violates the First Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment. *Schneider v New Jersey*, 308 US 147, 160; 60 S Ct 146; 84 L Ed 155 (1939).

### III. CONSTITUTIONALITY OF CANON 7(B)(1)(d)

Respondent argues that Canon 7(B)(1)(d) of the Michigan Code of Judicial Conduct is unconstitutional and overbroad on its face and as applied to his conduct. We conclude that the canon is facially unconstitutional because it is not narrowly tailored to serve the state's compelling interest in maintaining the integrity of the election process and ensuring public confidence in the judiciary.

---

vides that a candidate "shall not" use the form of public communication. Alabama similarly prohibits misrepresentations and deceptive or misleading statements. Alabama Canons of Judicial Ethics, Canon 7B(1)(c) provides that a candidate "shall not misrepresent his or her identity, qualification, present position, or other fact." Under Canon 7B(2) of the Alabama canons, a candidate may not

> [p]ost, publish, broadcast, transmit, circulate, or distribute false information concerning a judicial candidate or an opponent, either knowing the information to be false or with reckless disregard of whether that information is false; or post, publish, broadcast, transmit, circulate, or distribute true information about a judicial candidate or an opponent that would be deceiving or misleading to a reasonable person.

Like Alabama, Ohio prohibits misrepresentations. Ohio Code of Judicial Conduct, Canon 7(B)(2)(f) prohibits a candidate from "[k]nowingly misrepresent[ing] his or her identity, qualifications, present position, or other fact or the identity, qualifications, present position, or other fact of an opponent." Ohio also imposes other detailed restrictions on campaign speech. Canon 7(D) provides that a candidate "shall not knowingly or with reckless disregard" (1) make false statements concerning specifically enumerated subjects, (2) make specific statements involving the use of a title, the term "judge," and the term "re-elect," or (3) state that a candidate has been "arrested, indicted, or convicted of any crime" without disclosing the outcome of pending or concluded legal proceedings.

A. APPLICATION OF THE OVERBREADTH DOCTRINE

Initially, respondent may challenge the constitutionality of Canon 7(B)(1)(d) on its face. We accept respondent's argument that the overbreadth doctrine applies to this case. That doctrine permits " 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' " *Broadrick v Oklahoma*, 413 US 601, 612; 93 S Ct 2908; 37 L Ed 2d 830 (1973), quoting *Dombrowski v Pfister*, 380 US 479, 486; 85 S Ct 1116; 14 L Ed 2d 22 (1965). It thus allows a party to challenge a law written so broadly that it may inhibit the constitutionally protected speech of third parties, even though the party's own conduct may be unprotected. *Los Angeles Police Dep't v United Reporting Publishing Corp*, 528 US 32, ___; 120 S Ct 483, 488-489; 145 L Ed 2d 451 (1999).

The overbreadth doctrine is an exception to the traditional rule of practice that "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick, supra* at 610. The traditional rule "reflects two 'cardinal principles' of our constitutional order: the personal nature of constitutional rights and the prudential limitations on constitutional adjudication." *Los Angeles Police Dep't, supra*, 120 S Ct 489. The overbreadth doctrine, on the other hand, rests on the prediction that third parties will refrain from protected expression because of the statute. *Los Angeles City Council v Taxpayers for Vincent*, 466 US 789,

799; 104 S Ct 2118; 80 L Ed 2d 772 (1984). Under these circumstances, the "transcendent value to all society of constitutionally protected expression" justifies an exception to the traditional rule of practice. *Gooding v Wilson*, 405 US 518, 521; 92 S Ct 1103; 31 L Ed 2d 408 (1972).

The overbreadth doctrine is not, however, "casually employed," even in a case involving a First Amendment challenge. *Los Angeles Police Dep't, supra*, 120 S Ct 489. Because it is "manifestly, strong medicine," the Court employs it with hesitation. *Broadrick, supra* at 613. Therefore, substantial overbreadth is required. *Id.* at 615. "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Los Angeles City Council, supra* at 801.

Canon 7(B)(1)(d) authorizes disciplinary action for a candidate's speech during an election campaign, which is properly characterized as "core political speech." *McIntyre, supra* at 347. Further, the canon sweeps broadly, regulating all "form[s] of public communication."

That the canon is not a criminal statute is of no moment. *Los Angeles Police Dep't, supra*, 120 S Ct 488. A candidate for judicial office who speaks out during the election risks adverse consequences for the content of his speech. The United States Supreme Court has, in fact, considered facial challenges to attorney disciplinary rules that attach adverse consequences to public noncommercial speech. Compare *Gentile v State Bar of Nevada*, 501 US 1030; 111 S Ct 2720; 115 L Ed 2d 888 (1991) (considering a challenge

to a disciplinary rule that restricted extrajudicial statements regarding pending adjudicative proceedings), with *Bates v State Bar of Arizona*, 433 US 350, 379-381; 97 S Ct 2691; 53 L Ed 2d 810 (1977) (holding that the First Amendment overbreadth doctrine does not apply to advertising by members of a profession).

Accordingly, a realistic danger exists that Canon 7(B)(1)(d) will compromise recognized First Amendment protections of parties not before this Court. Thus, respondent may facially challenge the canon on overbreadth grounds. *Los Angeles City Council*, *supra* at 801.

### B. LEVEL OF SCRUTINY

To determine the constitutionality of an ethics rule, we weigh the state's interests against the candidate's First Amendment interest in the kind of speech at issue. See *Gentile, supra* at 1073. Canon 7(B)(1)(d) restricts political expression that "occupies the core of the protection afforded by the First Amendment." *McIntyre, supra* at 346. Accordingly, we apply exacting scrutiny and uphold the canon only if it is narrowly tailored to serve a compelling state interest. *Id.* at 347.

In *Buckley v Valeo*, 424 US 1, 14-15; 96 S Ct 612; 46 L Ed 2d 659 (1976), the Supreme Court explained the importance of political speech:

> Discussions of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v United States*,

354 US 476, 484; 77 S Ct 1304, 1308; 1 L Ed 2d 1498 (1957). Although First Amendment protections are not confined to "the exposition of ideas," *Winters v New York,* 333 US 507, 510; 68 S Ct 665, 667; 92 L Ed 840 (1948), "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates . . . ." *Mills v Alabama,* 384 US 214, 218; 86 S Ct 1434, 1437; 16 L Ed 2d 484 (1966). This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co v Sullivan,* 376 US 254, 270; 84 S Ct 710, 721; 11 L Ed 2d 686 (1964). In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co v Roy,* 401 US 265, 272; 91 S Ct 621, 625; 28 L Ed 2d 35 (1971), "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."

Further, a candidate has a First Amendment right to discuss public issues and advocate his own election. *Id.* at 52. Therefore, when the state seeks to restrict this "core political speech," courts apply "exacting scrutiny," upholding the restriction only if it is narrowly tailored to serve a compelling state interest. *McIntyre, supra* at 347; *Brown v Hartlage,* 456 US 45, 53-54; 102 S Ct 1523; 71 L Ed 2d 732 (1982).

We accept the principle that judges are different from legislative and executive-branch officials. By providing for the election of judges,[7] the people of Michigan have not transformed judges into legislators

---

[7] Const 1963, art 6, §§ 2, 8, 12, 16. See also MCL 600.8204; MSA 27A.8204 (providing for the election of district court judges).

or executives. They have, however, adopted a method of judicial selection that takes place in the arena in which the First Amendment affords its broadest protection. That the candidate seeks judicial office does not change the nature of the candidate's speech for First Amendment purposes. Rather, the differences between judges and other government officials bear on the strength of the state's interest in restricting political speech. *Buckley v Illinois Judicial Inquiry Bd*, 997 F2d 224, 228 (CA 7, 1993). Accordingly, because Canon 7(B)(1)(d) restricts core political speech, we will uphold it only if it is narrowly tailored to serve a compelling state interest. *McIntyre, supra* at 347.

### C. APPLICATION OF EXACTING SCRUTINY

We conclude that Canon 7(B)(1)(d) serves compelling state interests. First, the state has a compelling interest in preventing fraud and libel. See *Garrison v Louisiana*, 379 US 64; 85 S Ct 209; 13 L Ed 2d 125 (1964); *New York Times Co, supra*. "[T]his interest carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large." *McIntyre, supra* at 349. States have an interest in preserving the integrity of the election process. *Brown, supra* at 52. This interest extends to protecting the process from distortions caused by false statements. *Id.* at 61.

The state also has a compelling interest in preserving the integrity of the judiciary. In *Stretton v Disciplinary Bd of the Supreme Court of Pennsylvania,*

944 F2d 137, 142 (CA 3, 1991), the Third Circuit recognized this important interest:

> There can be no question . . . that a state has a compelling interest in the integrity of its judiciary. In *Cox v Louisiana*, 379 US 559; 85 S Ct 476; 13 L Ed 2d 487 (1965), the Court upheld a state statute barring picketing near a courthouse, pointing out that "[a] State may also properly protect the judicial process from being misjudged in the minds of the public." *Id.* at 565. In another case, Justice Stewart said, "There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary." *Landmark Communications, Inc v Virginia*, 435 US 829, 848; 98 S Ct 1535, 1546; 56 L Ed 2d 1 (1978) (Stewart, J., concurring).

The state's interest in the integrity of the judiciary extends to preserving public confidence in the judiciary. The appearance of fairness and impartiality is necessary to foster the people's willingness to accept and follow court orders. See, generally, Snyder, *The constitutionality and consequences of restrictions on campaign speech by candidates for judicial office*, 35 UCLA L R 207, 239-240 (1987). The state's interest in protecting the reputation of the judiciary is also a compelling interest. *In re Kaiser*, 111 Wash 2d 275, 288; 759 P2d 392 (1988); see also Shepard, *supra* at 1067. We conclude, however, that Canon 7(B)(1)(d) is facially unconstitutional because it is not narrowly tailored to further the state's compelling interest.

In *Brown v Hartlage*, *supra*, the Supreme Court considered a Kentucky statute that voided an election because the victorious candidate had announced during his campaign that he intended to serve at a salary less than that fixed by law. The Court rejected the state's argument that its interest in protecting the political process from distortions caused by false or

inaccurate statements justified the sanction. The Court concluded that, absent a showing that the candidate made the disputed statement other than in good faith and with knowledge of its falsity, or that he made it with reckless disregard of its falsity, the sanction "was inconsistent with the atmosphere of robust political debate protected by the First Amendment." *Brown, supra* at 62.

*Brown, supra* at 60-61, determined that First Amendment extends protection to all statements, but not the same level of protection:

> Of course, demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements. *Gertz v Robert Welch, Inc*, 418 US 323, 340; 94 S Ct 2997, 3007; 41 L Ed 2d 789 (1974). But "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive,' " *New York Times Co v Sullivan*, 376 US 254, 271-272; 84 S Ct 710, 721; 11 L Ed 2d 686 (1964), quoting *NAACP v Button*, 371 US 415, 433; 83 S Ct 328, 338; 9 L Ed 2d 405 (1963).

The Court then concluded that the harsh sanction, as applied to the candidate in *Brown*, did not afford the requisite breathing space. In so concluding, the Court explained that "more speech, not enforced silence" is the preferred remedy for untrue and inaccurate campaign speech. *Id.* at 61, quoting *Whitney v California,* 274 US 357, 377; 47 S Ct 641; 71 L Ed 1095 (1927) (Brandeis, J., concurring).

Like the statute in *Brown*, Canon 7(B)(1)(d) attaches adverse consequences to a candidate's statements that are not knowingly false or made with reckless disregard for truth or falsity. The canon applies to any statement that the candidate "reasona-

bly should know is false, fraudulent, misleading, [or] deceptive." It also applies to a statement that "contains a material misrepresentation of fact or law," and a statement that "omits a fact necessary to make the statement considered as a whole not materially misleading." It further prohibits a statement that is "likely to create an unjustified expectation about results the candidate can achieve." The canon, thus, essentially applies the restrictions imposed on lawyer advertising[8] to a candidate's political speech.

The Supreme Court has held that the state may prohibit false, deceptive or misleading lawyer advertising and advertising concerning unlawful activities. *Zauderer v Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 US 626, 638; 105 S Ct 2265; 85 L Ed 2d 652 (1985); *In re R M J,* 455 US 191, 200-203; 102 S Ct 929; 71 L Ed 2d 64 (1982). Moreover, although the First Amendment protects truthful advertising relating to lawful activities, *In re R M J, supra* at 203, the state may regulate it nonetheless if the regulation is narrowly drawn and directly and

---

[8] MRPC 7.1 provides:

A lawyer may, on the lawyer's own behalf, on behalf of a partner or associate, or on behalf of any other lawyer affiliated with the lawyer or the lawyer's law firm, use or participate in the use of any form of public communication that is not false, fraudulent, misleading, or deceptive. A communication shall not:

(a) contain a material misrepresentation of fact or law, or omit a fact necessary to make the statement considered as a whole not materially misleading;

(b) be likely to create an unjustified expectation about results the lawyer can achieve, or state or imply that the lawyer can achieve results by means that violate the Rules of Professional Conduct or other law; or

(c) compare the lawyer's services with other lawyers' services, unless the comparison can be factually substantiated.

materially advances a substantial government interest. *Florida Bar v Went For It, Inc*, 515 US 618, 624; 115 S Ct 2371; 132 L Ed 2d 541 (1995).

Canon 7(B)(1)(d), however, regulates political speech, not commercial speech. The Supreme Court has emphasized that the state may regulate commercial speech to an extent that it cannot regulate core First Amendment speech. In *Florida Bar, supra* at 623, it explained:

> We have always been careful to distinguish commercial speech from speech at the First Amendment's core. " 'Commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.' " *Board of Trustees of State Univ of NY v Fox*, 492 US 469, 477; 109 S Ct 3028; 106 L Ed 2d 388 (1989), quoting *Ohralik v Ohio State Bar Ass'n*, 436 US 447, 456; 98 S Ct 1912; 56 L Ed 2d 444 (1978). We have observed that " '[t]o require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech.' " 492 US at 481, quoting *Ohralik, supra*, 436 US at 456.

We agree that the state's interest in preserving the integrity of the judiciary supports the imposition of greater restrictions on a candidate's speech during a campaign for judicial office than is permissible in other campaigns. See *In re Palmisano*, 70 F3d 483, 487 (CA 7, 1995). That interest, albeit compelling, does not, however, support applying permissible restrictions on commercial speech to what is core political speech. We conclude that Canon 7(B)(1)(d) unnecessarily circumscribes protected expression.

Canon 7(B)(1)(d) greatly chills debate regarding the qualifications of candidates for judicial office. It applies to all statements, not merely those statements that bear on the impartiality of the judiciary.[9] A candidate for judicial office faces adverse consequences for statements that are not false, but, rather, are found misleading or deceptive. Further, the canon extends beyond the candidate's actual statement to permit discipline for factual omissions. Faced with the prospect of future disciplinary action, a candidate's safest course may sometimes be to remain silent on many issues. To avoid the risk of discipline,

---

[9] Canon 7(B)(1)(c) concerns statements that may prompt the public to question the impartiality of the judiciary. It provides that candidates for judicial office should not "make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office." Courts of other jurisdictions have recognized that this and other similar restrictions serve a compelling state interest in preserving the fairness and impartiality of the legal system, but have differed on whether a particular restriction is narrowly tailored to serve that interest. See, e.g., *Stretton, supra* at 142-143 (upholding a judicial canon to the extent that the provision was narrowly interpreted to prohibit candidates from expressing an opinion only on issues that might come before them for resolution in their capacity as judges); *Buckley, supra,* 997 F2d 231 (declaring unconstitutional a judicial canon that prohibited candidates from announcing views on disputed legal and political issues); *Ackerson v Kentucky Judicial Retirement & Removal Comm,* 776 F Supp 309, 313-316 (WD Ky, 1991) (holding a canon unconstitutionally overbroad to the extent that it prohibited campaign commitments regarding administrative issues, but upholding a prohibition regarding issues that were likely to come before the court); *Republican Party of Minnesota v Kelly,* 63 F Supp 2d 967, 983-986 (D Minn, 1999) (upholding a canon that prohibited candidates from announcing their views on disputed legal or political issues on concluding that the Minnesota Supreme Court would narrowly construe it to apply only to issues that may come before the court for resolution); *Deters v Judicial Retirement & Removal Comm,* 873 SW2d 200, 204-205 (Ky, 1994) (upholding a judicial canon that prohibited candidates from expressing an opinion on issues that were likely to come before the court).

The JTC has not alleged that respondent violated Canon 7(B)(1)(c) by distributing his campaign literature. Accordingly, we do not consider the constitutionality of that canon.

a judicial candidate will merely state academic credentials, professional experience, and endorsements received.

A rationale for judicial elections is that meaningful debate should periodically take place concerning the overall direction of the courts and the role of individual judges in contributing to that direction. Such debate is impossible if judicial candidates are overly fearful of potential discipline for what they say. By chilling this debate, Canon 7(B)(1)(d) impedes the public's ability to influence the direction of the courts through the electoral process.

We recognize that the broad language of the canon is intended to promote civility in campaigns for judicial office.[10] Nevertheless, the state's interest in preserving public confidence in the judiciary does not support the sweeping restraints imposed by Canon 7(B)(1)(d). The prohibition on misleading and deceptive statements quells the exchange of ideas because the safest response to the risk of disciplinary action may sometimes be to remain silent. The Supreme Court explained in *Brown, supra* at 61, that the preferred First Amendment remedy for misstatements and misrepresentations during the campaign is to encourage speech, not stifle it. We conclude that

---

[10] Chief Justice Randall T. Shepard of the Indiana Supreme Court explained the rationale for this broad proscription on campaign speech in his law review article:

> The American tradition sets judges aside from the hurly-burly of sometimes unseemly political strife. We place courts and judges on a higher plateau and hope that in doing so they will act the part and ask us to do the same on matters of importance. Consignment of judges to regular rough-and-tumble politics makes the judiciary less capable of filling this role. [Shepard, *supra* at 1067.]

Canon 7(B)(1)(d) fails to provide the necessary breathing space to satisfy the First Amendment.

We therefore conclude that Canon 7(B)(1)(d) is not narrowly tailored to serve the state's compelling interests. As the Supreme Court observed in *Brown, supra* at 60:

> [The First] Amendment embodies our trust in the free exchange of ideas as the means by which the people are to choose between good ideas and bad, and between candidates for political office. The State's fear that voters might make an ill-advised choice does not provide the State with a compelling justification for limiting speech.

Accordingly, we hold that Canon 7(B)(1)(d) is facially unconstitutional.

### IV. SAVING CONSTRUCTION

Today, we narrow Canon 7(B)(1)(d) to prohibit a candidate for judicial office from knowingly or recklessly using or participating in the use of any form of public communication that is false. We therefore amend Canon 7(B)(1)(d) to provide that a candidate for judicial office: "should not knowingly, or with reckless disregard, use or participate in the use of any form of public communication that is false."

Const 1963, art 6, §§ 4, 30 empower this Court to control the conduct of members of the state judiciary. See *In re Probert*, 411 Mich 210, 229-231; 308 NW2d 773 (1981). Exercising our authority, we have adopted the Code of Judicial Conduct to guide judges. We did not, however, intend to extend Canon 7(B)(1)(d) beyond proper constitutional boundaries.

We conclude that limiting the reach of Canon 7(B)(1)(d) to known false public communications and

false public communications made with reckless disregard for their truth or falsity renders the canon narrowly tailored to serve the state's interest in preserving the integrity of elections and the judiciary. False statements "are not protected by the First Amendment in the same manner as truthful statements." *Brown, supra* at 60. By limiting the scope of the canon to known and reckless false public statements, the canon provides the necessary "breathing space" for freedom of expression. *Id.* at 61.[11]

The determination whether a candidate recklessly disregarded the truth or falsity of a public communication is an objective one. We reject as inappropriate the subjective "actual malice" standard employed in defamation cases. *Bose Corp v Consumers Union of United States, Inc,* 466 US 485, 511, n 30; 104 S Ct 1949; 80 L Ed 2d 502 (1984); *New York Times, supra* at 280.

In adopting an objective test, we join courts in other jurisdictions that have adopted the objective standard in attorney disciplinary proceedings arising from a lawyer's criticism of a judge. See, e.g., *Standing Committee on Discipline of the United States Dist Court for the Central Dist of California v Yagman,* 55 F3d 1430, 1437, n 12 and accompanying text (CA 9, 1995) (cases collected), *In re Graham,* 453 NW2d 313, 321-322 (Minn, 1990), *In re Westfall,* 808 SW2d 829, 837 (Mo, 1991), and *In re Holtzman,* 78 NY2d 184, 192; 573 NYS2d 39; 577 NE2d 30 (1991). But see *Eisenberg v Boardman,* 302 F Supp 1360,

---

[11] Our narrow construction of Canon 7(B)(1)(d) mirrors MRPC 8.2(a), which governs a lawyer's statements regarding judges and other public legal officers.

1362 (WD Wis, 1969), and *State Bar of Texas v Semaan*, 508 SW2d 429, 432-433 (Tex Civ App, 1974).

As the Court of Appeals of New York observed in *Holtzman, supra* at 192, adopting a subjective standard "would immunize all accusations, however reckless or irresponsible, from censure as long as the attorney uttering them did not actually entertain serious doubts as to their truth . . . ." The state's interest in protecting the public, the administration of justice, and the legal profession supports applying a different standard in disciplinary proceedings. *United States Dist Court for the Eastern Dist of Washington v Sandlin*, 12 F3d 861, 867 (CA 9, 1993).

*Yagman, supra* at 1437-1438, explained the rationale for adopting an objective standard:

> [T]here are significant differences between the interests served by defamation law and those served by rules of professional ethics. Defamation actions seek to remedy an essentially private wrong by compensating individuals for harm caused to their reputation and standing in the community. Ethical rules that prohibit false statements impugning the integrity of judges, by contrast, are not designed to shield judges from unpleasant or offensive criticism, but to preserve public confidence in the fairness and impartiality of our system of justice. . . .
>
> Though attorneys can play an important role in exposing problems with the judicial system . . . false statements impugning the integrity of a judge erode public confidence without serving to publicize problems that justifiably deserve attention. *Sandlin* held that an objective malice standard strikes a constitutionally permissible balance between an attorney's right to criticize the judiciary and the public's interest in preserving confidence in the judicial system: Lawyers may freely voice criticisms supported by a reasonable factual basis even if they turn out to be mistaken.

We similarly conclude that an objective standard for determining violations of Canon 7(B)(1)(d) strikes a balance between the candidate's First Amendment rights and the state's interest in preserving confidence in the judicial system. Cf. *Yagman, supra* at 1438. The state's compelling interest in preserving public confidence in the judiciary supports applying a different standard than that applicable in defamation cases. Under the objective standard, a candidate may still freely exercise First Amendment rights and make statements supported by a reasonable factual basis, even if the candidate turns out to be mistaken. We therefore adopt an objective standard for determining whether a candidate uses a form of public communication during the campaign with reckless disregard of its truth or falsity.

### V. APPLICATION OF NARROWED CANON TO RESPONDENT'S CONDUCT

In *Osborne v Ohio*, 495 US 103, 115-122; 110 S Ct 1691; 109 L Ed 2d 98 (1990), the Court held in the criminal context that a state court may adopt a narrow construction of a statute in response to an overbreadth challenge and then apply the statute, as construed, to past conduct. The defendant must, however, have had notice, i.e., "fair warning," that his conduct was criminal. *Id.* at 115. Further, the defendant must have been convicted under the statute as it was subsequently construed, not as it was originally written. *Id.* at 118.

Applying *Osborne* by analogy to the disciplinary context, we conclude that respondent had notice that he was subject to discipline for knowingly or recklessly using forms of public communication that were

false. Canon 7(B)(1)(d) provided that a candidate for judicial office "should not use or participate in the use of any form of public communication that the candidate knows or reasonably should know is false . . . ." The phrase "knows or reasonably should know is false" encompasses known false statements and those made with reckless disregard for their truth or falsity. Accordingly, respondent had "fair warning" that his alleged conduct was prohibited by the Code of Judicial Conduct.

Because the JTC did not have the benefit of our decision on the constitutionality of Canon 7(B)(1)(d) to guide it in determining whether to recommend discipline, we remand for a determination whether respondent committed misconduct by violating Canon 7(B)(1)(d), as construed today.[12] If the JTC finds misconduct under the narrowed canon, it shall make a new recommendation regarding discipline.[13]

### VI. CONCLUSION

We conclude that Canon 7(B)(1)(d) is facially unconstitutional. We therefore narrow the canon to apply only to public communications that the candidate for judicial office knew were false or were used by the candidate with reckless disregard for their truth or falsity. We further conclude that the determination whether a candidate recklessly disregarded the

---

[12] On remand, the JTC shall provide the parties an opportunity to file supplemental briefs on the issue whether respondent's conduct violated the narrowed canon.

[13] In light of our decision to remand for further proceedings, we do not address respondent's remaining arguments. Respondent may raise those arguments in a petition challenging the JTC recommendation on remand.

truth or falsity of a public communication involves an objective inquiry.

We remand this case to the Judicial Tenure Commission for further proceedings consistent with this opinion.

WEAVER, C.J., and CAVANAGH, KELLY, TAYLOR, YOUNG, and MARKMAN, JJ., concurred with CORRIGAN, J.