**George M. WEAVER, D. William Tinkler, and Robert A. Rohm, Plaintiffs,**

v.

**Alice D. BONNER, et al., Defendants.**

**No. CivA198CV2011WBH.**

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 25, 2000.

---

Ralph S. Goldberg, Office of Ralph S. Goldberg, Decatur, GA, for American Civil Liberties Union of Ga., movant.

David James Myers, Lord Bissell & Brook, Atlanta, GA, William B. Hollberg, Hollberg & Weaver, Atlanta, GA, for George M. Weaver, D. William Tinklier, Robert A. Rohm.

James Clifton Rawls, Eric Schroeder, Powell Goldstein Frazer & Murphy, Atlanta, GA, for Alice D. Bonner, Charles A. Harris, John A. James, Earle B. May, Jr.

Robert L. Goldstucker, Paul Jay Pontrelli, Nall & Miller, for State Bar of Georgia.

## ORDER

HUNT, District Judge.

This action is before the Court on the parties' cross-motions for summary judgment. The Court heard oral argument on these motions on August 9, 2000. For the reasons stated below, the motions are GRANTED IN PART and DENIED IN PART.[1]

## I. BACKGROUND

This action arises out of plaintiff George M. Weaver's 1998 candidacy for the seat on the Supreme Court of Georgia currently held by Justice Leah J. Sears. Weaver and co-plaintiffs Robert Rohm and D. William Tinkler (registered voters in Georgia) contend that defendants violated their free speech and due process rights by enforcing allegedly unconstitutional provisions of the Georgia Judicial Conduct Code by issuing a public statement, without notice or a hearing, that wrongly accused Weaver of making false statements in his campaign materials. They contend that defendants' issuance of the public statement shortly before the election seriously injured Weaver's campaign and deprived Weaver and the voters of a run-off election.

The defendants are the State Bar of Georgia and members and the director of the Georgia Judicial Qualifications Commission ("JQC"), which was created by Constitutional Amendment in 1972 and charged to investigate and make recommendations to the Supreme Court of Georgia concerning the ethical conduct of Georgia judges and judicial candidates. Pursuant to the Georgia Constitution, the Supreme Court of Georgia is authorized to adopt rules dealing with discipline, removal, and involuntary retirement of judges. Pursuant to that authority, the Supreme Court of Georgia adopted the Georgia Code of Judicial Conduct ("the Code") and established the JQC to enforce the Code. The Supreme Court of Georgia also adopted rules of the JQC ("the Rules"), and the JQC operates under the Rules.

Canon 7(B)(1)(d) of the Code provides that judges and candidates for judicial office:

> shall not use or participate in the use of any form of public communication which the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or contains a material misrepresentation of fact or law or omits a fact necessary to make the communication considered as a whole not materially misleading or which is likely to create an unjustified expectation about results the candidate can achieve.

Rule 27 of the JQC creates a three-person special committee of the JQC that is empowered to review campaign speech by candidates for judicial office. This special committee is to determine whether the speech complies with Canon 7, and, in circumstances it deems appropriate, is to issue "cease and desist requests" and public statements "setting out the violations believed to exist and the failure by the candidate and/or organization to honor the cease-and-desist request."

As a part of his campaign, Weaver distributed a brochure characterizing Justice

---

1. The Court GRANTS the various motions to exceed page limitations [68–1, 78–1, 80–1, 82–1] and for leave to file additional briefs [68–2, 68–3, 80–2].

Sears' views on same-sex marriage, traditional moral standards, and the electric chair. The relevant language in the first brochure read:

(1) "She would require the State to license same-sex marriages."

(2) "She has referred to traditional moral standards as 'pathetic and disgraceful.'"

(3) "Justice Sears has called the electric chair 'silly,'" with the words "THE DEATH PENALTY" in an adjacent column.

Although the special committee refused Weaver's request that it review this brochure prior to its distribution, it received complaints about the brochure after its distribution and then conducted a review. The special committee determined that the three sentences quoted above violated Canon 7(B)(1)(d) and issued Weaver a confidential cease and desist request on June 11, 1998, in which it requested that he cease using the language it found objectionable.

Weaver agreed to comply with this confidential request, and revised the brochure's language on June 15, 1998 in an attempt to address the committee's concerns. The revised language in the second brochure read:

(1) "She has stated that 'this is not yet a perfect world' because 'lesbian and gay couples in America cannot legally marry.'"

(2) "When the Supreme Court upheld a traditional moral standard, she said the result was 'pathetic and disgraceful.'"

(3) "Justice Sears says she supports the death penalty but calls the electric chair 'silly.'"

Weaver and his campaign committee then produced and aired a television advertisement in support of his campaign. In the television advertisement:

(1) The narrator states: "What does Justice Leah Sears stand for? Same sex marriage." This statement is made while a graphic shows: "Same Sex Marriage."

(2) The narrator states: "She's questioned the constitutionality of laws prohibiting sex with children under fourteen." This statement is made while a graphic shows: "Questioned Laws Protecting Our Children."

(3) The narrator states: "And she has called the electric chair silly." This statement is made while a graphic shows: "Called Electric Chair Silly."

After receiving complaints about the television advertisement, the special committee found the language in the television advertisement to be in violation of its previous cease and desist request regarding the first brochure. Without giving Weaver notice of these complaints or a further opportunity to be heard, it issued a public statement on July 15, 1998 expressing its repudiation of Weaver's television advertisement. The public statement asserted that Weaver's television campaign advertisement was in violation of the previous request regarding the first brochure, and was "unethical, unfair, false, and intentionally deceptive." The statement also asserted that the television advertisement "was nothing short of an intentional and blatant violation of candidate Weaver's previous written assurance of his intent to comply with the Committee's original cease and desist request."

Weaver filed this action on July 16, 1998. In the July 21, 1998 election, Justice Sears was re-elected with 378,151 votes (54 percent). Weaver received 195,017 votes (27.9 percent). William Aynes, a third candidate, received 126,512 votes (18.1 percent). Weaver contends that a runoff election would have been required if Justice Sears had received 28,311 fewer votes.

On July 30, 1998 the JQC transmitted materials from its files regarding Weaver to the General Counsel for the State Bar of Georgia for appropriate action under applicable bar rules. On March 15, 1999, in granting in part and denying in part

defendants' motion to dismiss, the Court held that the JQC members were entitled to qualified immunity and that plaintiffs' request for a new election was without merit. Hence, all claims for money damages have been eliminated and only claims for declaratory and injunctive relief remain.

## II. DISCUSSION

### A. Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56, a court shall grant a motion for summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where the nonmoving party bears the burden of proof at trial, the moving party must demonstrate to the Court that "there is an absence of evidence to support the nonmoving party's case," *Celotex v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), or must put forth affirmative evidence negating an element of the nonmoving party's case, *Fitzpatrick v. Atlanta,* 2 F.3d 1112, 1116 (11th Cir.1993). It is then the responsibility of the nonmoving party, by revealing evidence outside of the pleadings, to show that evidence supporting its case does exist or that the element sought to be negated remains a genuine issue of material fact to be tried. *Id.* Essentially, this requires the nonmoving party to come forward with evidence sufficient to withstand a directed verdict on this issue at trial. *Id.* at 1116–17.

The nonmoving party is not required to carry its burden of proof at the summary judgment stage. In analyzing the case, the Court views the facts in the light most favorable to the nonmoving party and makes all factual inferences in favor of that party. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir. 1993). "The court must avoid weighing conflicting evidence or making credibility determinations." *Id.* at 919. "Where a reasonable fact finder may 'draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment.'" *Id.* (quoting *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir.1989)).

### B. Canon 7(B)(1)(d)

■ The Court will first address plaintiffs' facial challenge to Canon 7(B)(1)(d). After careful consideration, the Court concludes that Canon 7(B)(1)(d) is facially unconstitutional because it violates the overbreadth doctrine.

■ An overbreadth challenge is based on a statute's "possible direct and indirect burdens on speech." *United States v. Acheson,* 195 F.3d 645, 650 (11th Cir.1999) (quoting *American Booksellers v. Webb,* 919 F.2d 1493, 1499–1500 (11th Cir.1990)). The doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 1857, 144 L.Ed.2d 67 (1999), quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612–615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). It is designed to protect "the public from the chilling effect such a statute has on protected speech; the court will strike down the statute even though in the case before the court the governmental entity enforced the statute against those engaged in unprotected activities." *Acheson,* 195 F.3d at 650 (quoting *Nationalist Movement v. City of Cumming,* 934 F.2d 1482, 1485 (11th Cir.1991) (Tjoflat, J., dissenting)).

■ As an initial matter, it must be noted that because Canon 7(B)(1)(d) restricts political expression regarding the qualifications of candidates for public office (expression occupying the core of the First Amendment's protections), the Court is to apply "exacting scrutiny" when analyzing the Canon's constitutionality. *McIntyre v. Ohio Elections Com'n,* 514 U.S. 334, 347, 115 S.Ct. 1511, 1519, 131 L.Ed.2d 426

(1995). Under such an analysis, the Canon can be upheld only if it is "narrowly tailored to serve an overriding state interest." *McIntyre*, 514 U.S. at 347, 115 S.Ct. 1511. *See also Brown v. Hartlage*, 456 U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732 ("When a State seeks to restrict directly the offer of ideas by a candidate to the voters, the First Amendment surely requires that the restriction be demonstrably supported by not only a legitimate state interest, but a compelling one, and that the restriction operate without unnecessarily circumscribing protected expression.").

There appears to be little if any dispute that preserving the integrity and independence of its judiciary are compelling or overriding state interests, and the Court so finds. *See Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 848, 98 S.Ct. 1535, 1546, 56 L.Ed.2d 1 (1978) ("There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary.") (Stewart, J., concurring in the result.). A much more difficult question is whether Canon 7(B)(1)(d) is narrowly tailored to further those interests. The Court answers that question in the negative.

In reaching this conclusion, the Court is persuaded by the reasoning expressed by the Supreme Court of Michigan in *In re Chmura*, 461 Mich. 517, 608 N.W.2d 31 (2000). There, in applying exacting scrutiny, the court held that a virtually identical canon was "facially unconstitutional because it [was] not narrowly tailored to serve the state's compelling interest in maintaining the integrity of the election process and ensuring public confidence in the judiciary." *Id.* at 38.[2] Specifically, the *Chmura* court held that the only constitutionally permissible portion of Canon 7(B)(1)(d) was its proscription of knowingly false judicial campaign speech. According to the *Chmura* court, to survive exacting scrutiny the canon needed to be revised to provide simply that a candidate

for judicial office "should not knowingly, or with reckless disregard, use or participate in the use of any form of public communication that is false." *Id.* at 44. Furthermore, the *Chmura* court held that "[t]he determination whether a candidate recklessly disregarded the truth or falsity of a public communication is an objective one." *Id.*

Here, the Court finds, in line with *Chmura*, that although the state of Georgia has a sufficient interest in preserving the integrity and independence of its judiciary so as to support some restrictions on judicial campaign speech that are greater than those imposed on other types of campaigns, that interest is not sufficient to allow the state to do what it has done in Canon 7(B)(1)(d)—impose restrictions on core political speech akin to those permissibly imposed on commercial speech. *Id.* at 42. In the Court's view, Canon 7(B)(1)(d) violates the overbreadth doctrine because it fails to provide necessary "breathing space" to survive First Amendment scrutiny. "[E]rroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the breathing space that they need ... to survive." *Brown*, 456 U.S. at 60, 102 S.Ct. at 1532, (quoting *New York Times v. Sullivan*, 376 U.S. 254, 271–72, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)). The Canon goes well beyond applying to false statements that are knowingly made. It also applies to: (1) misleading, deceptive, and fraudulent statements, (2) statements containing material misrepresentations of fact or law, (3) statements that omit a fact necessary to make the communication considered as a whole not materially misleading, and (4) statements likely to create an unjustified expectation about results the candidate can achieve. It applies to these statements whether they are made knowingly or negligently. It chills debate by requiring candidates to attempt to determine whether a reasonable person

---

**2.** The only difference between the Georgia and Michigan canons is that Georgia's provides that a candidate "shall not" engage in prohibited speech whereas the Michigan canon provides that a candidate "should not" do so.

would view their speech as fraudulent, misleading, or somehow deceptive. It therefore has a great likelihood of forcing candidates to remain silent on questionable matters instead of risking adverse action. It violates the First Amendment.

As stated in *Chmura:*

A rationale for judicial elections is that meaningful debate should periodically take place concerning the overall direction of the courts and the role of individual judges in contributing to that direction. Such debate is impossible if judicial candidates are overly fearful of potential discipline for what they say. By chilling this debate, Canon 7(B)(1)(d) impedes the public's ability to influence the direction of the courts through the electoral process.

*Chmura,* 608 N.W.2d at 42–43. Accordingly, because the impermissible applications of Canon 7(B)(1)(d) are clearly substantial when judged in relation to the Canon's legitimate proscription of knowingly false judicial campaign speech, the Court finds that Canon 7(B)(1)(d) violates the First Amendment due to its overbreadth.

■ As a fall-back position, defendants contend that, if the Court agrees with *Chmura*'s reasoning and finds the Canon unconstitutionally overbroad, the Court can save the Canon by striking the words "reasonably should know," thereby eliminating the Canon's proscription of negligent speech. This the Court declines to do.[3]

As stated by the Seventh Circuit in *Buckley v. Illinois Judicial Inquiry Bd.,* 997 F.2d 224, 229 (7th Cir.1993), it is not a federal court's "proper business to patch up" a state judicial canon. *Id.* at 230. A "savings construction ... would cast us in the role of a Council of Revision empowered to make such changes in a proposed

enactment, state or federal, as might be necessary to render it constitutional. We are not authorized to play such a role." *Id.*

Even if the Court were otherwise inclined to save the statute, however, the Court would have a difficult time doing so here. It is true that "[i]t has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be readily susceptible to a narrowing construction that would make it constitutional, it will be upheld." *Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). As the Supreme Court further noted in *American Booksellers,* however, the key to this tenet "is that the statute must be readily susceptible to the limitation; we will not rewrite a state law to conform it to constitutional requirements." *Id.*

Canon 7(B)(1)(d) is not readily susceptible to a narrowing construction. In addition to having to strike the "reasonably should know" language, the Court would be forced to strike all language in the Canon following the word "false," and, to be consistent with *Chmura,* would perhaps have to actually add language regarding reckless disregard. Furthermore, as defendants themselves point out, the Court would also have to impose the "objective standard" for determining truth or falsity imposed in *Chmura.* Thus, the Court would have to re-write the Canon in order to save it.

The Court recognizes that the overbreadth doctrine is "strong medicine" that is to be employed with hesitation. *Broadrick,* 413 U.S. at 613, 93 S.Ct. at 2916; *see also Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80

---

**3.** The Court's finding that Canon 7(B)(1)(d) is unconstitutional on its face due to its overbreadth renders it unnecessary to consider plaintiffs' vagueness (Count IV) and as applied (Count I) challenges to the Canon, and makes it unnecessary to consider defendants' contention that they properly narrowed the

Canon when dealing with this matter. *See Khodara Environmental Ex Rel. Eagle v. Beckman,* 91 F.Supp.2d 827, 860 (W.D.Pa.1999) (Court's finding that a law was unconstitutional on its face renders as applied challenge moot).

L.Ed.2d 772 (1984) ("[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds."). In the Court's view, however, such a danger exists here.[4]

### 3. Rule 27

■ Plaintiffs also contend that JQC Rule 27 is unconstitutional on its face because it impermissibly allows government intervention during campaigns. The Court does not agree.

Rule 27 provides:

In every year in which a general election is held in this State and at such other times as the Commission may deem appropriate, the Chair shall name three (3) members to a Special Committee on Judicial Election Campaign Intervention ("Special Committee") whose responsibility shall be to deal expeditiously with allegations of ethical misconduct in campaigns for judicial office. The membership of such committee shall consist of the senior member of each of the three (3) categories of the Commission memberships if available, and if not, the next most senior member from that category. The Commission Director shall also serve as ex-officio member. The objective of such committee shall be to alleviate unethical and unfair campaign practices in judicial elections, and to that end, the Special Committee shall have the following authority:

(b) Upon receipt of a complaint or otherwise receiving information facially indicating a violation by a judicial candidate of any provision of Canon 7 during the course of a campaign for judicial office, the Director shall immediately forward a copy of the same by facsimile and U.S. Mail to the Special Committee members and said committee shall:

1. Seek, from the complainant and/or subject of the complaint, such further information on the allegation of the complaint as it deems necessary;

2. Conduct such additional investigation as the Committee may deem necessary;

3. Determine whether the allegations of the complaint warrant speedy intervention and, if so, immediately issue a confidential cease and desist request to the candidate and/or organization believed to be engaging in unethical and/or unfair campaign practices; and if not, to dismiss the complaint and so notify the complaining party;

4. If a cease-and-desist request is disregarded or if the unethical or unfair campaign practices otherwise continue, the Committee is further authorized:

(a) to immediately release to all appropriate media outlets, as well as the complaining party and the person and/or organization complained against, a public statement setting out violations believed to exist and the failure by the candidate and/or organization to honor the cease-and-desist request; and/or

(b) to refer the matter to the full Commission for such action as may be appropriate under the applicable rules.

(c) All proceedings under this Rule shall be informal and non-adversarial, and the Special Committee shall act on all complaints within ten (10) days of receipt, either in person; by facsimile; by U.S. Mail; or by teleconference.

(d) Except as hereinabove specifically authorized, the proceedings of the Special Committee shall remain confidential as provided in Rule 20, and in no event, shall the Committee have the authority

---

4. The Court is not persuaded by plaintiffs' contention that Canon 7(B)(2), which provides that judicial candidates "shall not themselves ... solicit publicly stated support," violates the First Amendment. The Court agrees with defendants that this Canon serves the same compelling interests mentioned previously and is narrowly tailored to achieve those goals. Nor is the Court persuaded by plaintiffs' suggestion of an equal protection claim from the JQC's alleged unequal treatment of challengers versus incumbents.

to institute disciplinary action against any candidate for judicial office, which power is specifically reserved to the full Commission under applicable rules.

The Court is not persuaded that Rule 27 violates the First Amendment. It is well-settled that the government may actively "participate in the marketplace of ideas," and "contribute its own views to those of other speakers." *Muir v. Alabama Educational Television Commission,* 688 F.2d 1033, 1037 (5th Cir.1982) *(en banc).* As stated in *Block v. Meese:*

> We know of no case in which the first amendment has been held to be implicated by governmental action consisting of no more than governmental criticism of the speech's content. Nor does any case suggest that uninhibited, robust, and wide-open debate consists of debate from which the government is excluded, or an uninhibited marketplace of ideas one in which the government's wares cannot be advertised.

793 F.2d 1303, 1313 (D.C.Cir.1986).

Additionally, as defendants point out, examples of permissible government speech abound: legislative and executive officials criticize factual statements of political opponents and declare them true or untrue, *id.* at 1313–14; government officials criticize and condemn the speech of private corporations, *Penthouse International, Ltd. v. Meese,* 939 F.2d 1011, 1015–16 (D.C.Cir.1991); government agencies declare the truth or falsity of technical matters including inflation rates, population rates, etc., *P.A.M. News Corp. v. Butz,* 514 F.2d 272, 278 (D.C.Cir.1975); and the Federal Trade Commission has the power to enjoin speech and declare advertisements false and misleading, *Kraft, Inc. v. F.T.C.,* 970 F.2d 311, 324 (7th Cir.1992).

And, in the only reported case dealing with a rule somewhat similar to Rule 27, the Sixth Circuit held that the Ohio Election Commission's "truth-declaring" function (whereby the commission determines and proclaims to the electorate the truth of various campaign allegations) did not violate the First Amendment. *Pestrak v. Ohio Elections Commission,* 926 F.2d 573 (6th Cir.1991). The *Pestrak* court held:

> In this case, the Ohio Elections Commission does not violate the first amendment simply because it is a publicly created commission with a certain statutory mandate. We have no way of knowing the exact efficacy or degree of public trust given to its statements, as opposed to any of the agencies listed above, and we do not believe that the constitutionality or unconstitutionality of government-sponsored speech rests on whether that speech is believable to any particular proportion of the public. At bottom, the fact remains that the statements and findings of the Commission fall exactly within the tenet that the usual cure for false speech is more speech.

*Id.* at 579.

The Court recognizes that neither *Pestrak* nor any other cases cited by the parties involve the precise situation presented here—government speech during a campaign. In the Court's view, however, the principles behind *Pestrak, Block* and other related decisions are sound and apply here as well. The State's interest in the integrity of its judicial elections is a compelling one, compelling enough to support the State's desire to add its voice during, as well as after, judicial campaigns. "If the first amendment considers speakers to be so timid, or important ideas to be so fragile, that they are overwhelmed by knowledge of governmental disagreement, then it is hard to understand why official government action, which speaks infinitely louder than words, does not constantly disrupt the first amendment marketplace." *Block,* 793 F.2d at 1313.

At bottom, Rule 27, standing alone, does not muzzle speech, it instead offers the constitutionally preferred cure of more speech. *See Texas v. Johnson,* 491 U.S. 397, 419, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). The Rule does not give the Special Committee the power to censor or prohibit speech, to impose fines or other criminal

sanctions, or to institute or prosecute disciplinary actions. It only allows the Special Committee to make a public statement. Therefore, Rule 27 is not unconstitutional on its face. "It is ultimately up to the voters to judge both the propriety and truth of the official statements." *Pestrak*, 926 F.2d at 580.[5]

### D. Procedural Due Process

Lastly, the Court will address Count III, the procedural due process challenge, through which plaintiffs contend that Rule 27 is deficient because it does not provide proper procedural protections, most notably its failure to provide a formal hearing before issuance of a public statement.

 Initially, the Court notes that, to maintain such a claim, a plaintiff "must first show the deprivation of a liberty or property interest protected by the Due Process Clause." *Cypress Ins. Co. v. Clark*, 144 F.3d 1435, 1436 (11th Cir.1998). A plaintiff making such a claim must show more than damage to reputation—he must show "stigma plus," meaning he must make a showing that the "government official's conduct deprived [him] of a previously recognized property or liberty interest in addition to damaging [his] reputation." *Id.* Pretermitting the question of whether plaintiffs have made such a showing, however, the Court finds that the process afforded by Rule 27 is nevertheless constitutionally adequate.

Three factors are relevant to such a determination:

1. The private interest that will be affected by the official action;

2. The risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and

3. The Government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). And, as the Supreme Court further noted in *Mathews*, "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances ... Due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 902 (citations and quotations omitted).

Here, in light of the substantial time pressures inherent in campaigns and the flexibility called for in this area of the law, the Court finds Rule 27's lack of a formal hearing or other more formalized procedures is not fatal to its constitutionality, either on its face or as applied to Weaver. The procedures provided in Rule 27 sufficiently balance the state's interest in expeditiously resolving these issues against a candidate's interest in being heard. Each complaint is reviewed twice, first before the confidential cease-and-desist request, and again if such a request is claimed to have been violated. The Court agrees with defendants that requiring further procedural safeguards would be overly burdensome and unrealistic. Accordingly, the procedural due process claim is unavailing.[6]

### III. CONCLUSION

The Court does not strike Canon 7(B)(1)(d) lightly. Expressing concern

---

**5.** In light of the Court's conclusion in the previous section that Canon 7(B)(1)(d) is facially unconstitutional, it is unnecessary to address plaintiffs' "as applied" challenge to Rule 27 (Count I), as that challenge is predicated on enforcement of the facially unconstitutional canon. For the same reason, the Court declines to address plaintiffs' challenge to State Bar Standard 74, which provides for disbarment or other discipline of attorneys who violate "provisions of the Code of Judi-

cial Conduct applicable to candidates for public office."

**6.** The Court recognizes that plaintiffs point to other states' procedures that are more extensive than those in the present case. In those states, however, the implementing body contemplated discipline or criminal sanctions, instead of only the public statement as a sanction.

over the selection of judges, particularly those who serve statewide, is no longer the domain of law reviews and editorials. Abuses are no longer potential or theoretical; they have arrived. The people of Georgia have chosen to elect their judges. That decision, like all decisions, has consequences, one of which is that contested elections, with all their baggage, will occur. The state's understandable attempt to limit these consequences and impose civility on these elections through Canon 7(B)(1)(d) is simply impermissible as currently written.

The motions for summary judgment [64–1, 65–1] are GRANTED IN PART and DENIED IN PART. The Clerk is DIRECTED to enter judgment in favor of plaintiffs and against defendants on Count II as it relates to Canon 7(B)(1)(d), to enter judgment in favor of defendants and against plaintiffs on Count II as it relates to Canon 7(B)(2) and JQC Rule 27, to enter judgment in favor of defendants and against plaintiffs on Count III, and to close this case.