WEAVER, J.
(dissenting). I dissent from the majority’s decision to remand this case for the imposition of the agreed-to professional discipline, a reprimand of Mr. Fieger, and join Justice CAVANAGH’s opinion on the substantive issues in this case.
I write separately to dissent from the participation of Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN in this case.
Statements made during their respective judicial campaigns displaying bias and prejudice against Mr. Fieger require Chief Justice TAYLOR and Justices CORRIGAN, Young, and MARKMAN to recuse themselves from this case in which Mr. Fieger is himself a party.[1] Further, Chief Justice TAYLOR and Justices CORRIGAN and MARKMAN have become so “enmeshed” in matters involving Mr. Fieger as to make it inappropriate for *329 them to sit in a case in which Mr. Fieger is a party.[2] Thus, the participation in this case of Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN violates respondent’s rights to due process under the Fifth and the Fourteenth Amendment. Chief Justice TAYLOR and Justices Corrigan, Young, and Markman should have recused themselves from participating in this case.
In their joint opinion, Chief Justice TAYLOR and Justices Corrigan, Young, and Markman mischaracterize my dissent and motives. Further, their criticisms and personal attacks in the joint opinion of the majority justices are misleading, inaccurate, irrational, and irrelevant to the issues in this case.[3] The majority appears to be attacking the messenger rather than addressing the genuine issue of due process created by the displays of bias and prejudice in this case.[4]
*330 This Court has long recognized that a litigant has a right to an unbiased court:
One of the fundamental rights of a litigant under our judicial system is that he shall be entitled to a hearing before a court to which no taint of prejudice is attached. This is so firmly established as to regularly constituted courts as to need no comment.[5]
Further, an unbiased judge is essential to the due process guarantees of the Fifth and Fourteenth Amendment.[6] In order to protect due process, when a judge is sufficiently biased, the judge must be removed from the case in which the bias arises.[7]
Disqualification for personal bias against a party may be required in order to protect the party’s due process rights. When a judicial candidate has made a campaign statement displaying extreme animosity toward a spe *331 cific individual, once on the bench, the judge should be disqualified from hearing cases in which that individual is a party. If a judge has become so embroiled in conflicts with a defendant as to demonstrate hostility toward the defendant, the judge must be disqualified.
A
Here, the statements about Mr. Fieger made during their respective judicial campaigns require Chief Justice Taylor and Justices CORRIGAN, YOUNG, and Markman to recuse themselves from this case in which Mr. Fieger is a party. “Eveiy procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.”[8] A judge who has bias against one of the parties appearing before him could be tempted “not to hold the balance nice, clear and true.”[9] To avoid this possibility, due process requires that a judge who has made campaign statements demonstrating extreme antagonism toward an individual recuse himself or herself from a case in which that individual is a party. Friedland, Disqualification or suppression: Due process and the response to judicial campaign speech, 104 Colum L R 563 (2004).
Numerous cases of the United States Supreme Court hold that due process requires a lack of bias for or against a party.[10] Republican Party of Minnesota v White suggests that if campaign statements display a bias for *332 or against a particular individual, the statements could raise due process concerns for future litigants. The Court recognized that “lack of bias for or against either party to the proceeding” is the root meaning of “impartiality” in the judicial context.[11] The Court said that impartiality in this sense “assures equal application of the law” or “guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party.”[12] The Court confirmed that this meaning of impartiality has been used by numerous cases recognizing that an impartial judge is essential to due process.[13]
In Republican Party of Minnesota v White, the Court stated that it is speech for or against parties that raises problems of impartiality or the appearance of impartiality:
We think it plain that the announce clause [restricting judicial campaign speech] is not narrowly tailored to serve impartiality (or the appearance of impartiality) in this sense. Indeed, the clause is barely tailored to serve that interest at all, inasmuch as it does not restrict speech for or against particular parties, but rather speech for or against particular isswes.[14]
In so holding, the Court recognized that speech for or against particular parties in a case does implicate impartiality or the appearance of impartiality.
The Florida Supreme Court held that a judge who uttered campaign statements directed at a particular *333 individual should be disqualified from presiding over a case involving that individual.[15] In State ex rel La Russa v Himes, a judicial candidate made the following statements during an election campaign: “ ‘[T]he people are shot down in cold blood; the people are assaulted and their homes broken into, and what the people want is a judge who will put people like Philip La Russa and his associates away in Raiford [a state penitentiary],’ ” and “ ‘[P]eople like Philip La Russa and his associates cannot come into Court and get a license for gambling by a fine or to violate the lottery laws by a fine, but [I] would put them in Raiford where they belong[].’ ”[16]
The Florida Supreme Court held that these campaign statements disqualified the judge from subsequently presiding over a trial of Philip La Russa for violating lottery laws. The Court stated:
Fear that [La Russa] will not have a fair trial may in some cases be a mental attitude but if the conduct of the judge has been such as to create it, the law requires that he recuse himself. It may ultimately be as devoid of reality as the cenotaph is the remains of the hero it commemorates but if conclusively shown that the seed of fear was planted and the facts related give a reasonable man ground for belief that the judge is prejudiced, that is sufficient. It is contrary to all human experience to contend that a judge under the circumstances stated may single out one charged or that may be charged with crime and talk to the public about sending him to Raiford (State penitentiary) and then contend that the one singled out when hailed before the judge for trial had no ground for belief that the latter was prejudiced.[17]
Similarly, the campaign statements made by Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and *334 MARKMAN against Mr. Fieger would “give a reasonable man ground for belief” that they are prejudiced. Because their campaign statements display prejudice against Mr. Fieger, they should be disqualified from sitting in this case.
For example, on February 20, 2006, while this case was pending before this Court, the Committee to Reelect Justice Maura Corrigan sent out a fund-raising letter from former Governor John Engler stating that “[w]e cannot lower our guard should the Fiegers of the trial bar raise and spend large amounts of money in hopes of altering the election by an 11th hour sneak attack.” Former Governor John Engler may make any statements about Mr. Fieger with impunity, as long as he does not violate libel or slander laws. But Justice CORRIGAN cannot do so without potentially disqualifying herself from sitting in a case in which Mr. Fieger is a party. Justice CORRIGAN adopted former Governor Engler’s statement as her own when she had her campaign committee pay for and send out the former governor’s letter.[18] Justice CORRIGAN’S adoption of this statement identifying Mr. Fieger as a possible threat to Justice CORRIGAN’S reelection campaign as her own displays a bias against Mr. Fieger.
This display of bias is of special concern because this case, in which Mr. Fieger is a party, was pending at the time the letter was sent. On May 27, 2005, this Court granted leave to appeal in this case; on February 14, 2006, oral argument in this case was scheduled; on February 20, 2006, Justice CORRIGAN’s campaign issued the fund-raising letter; and 16 days later, on March 8, *335 2006, this case was argued before the Court. Now Justice CORRIGAN is deciding against Mr. Fieger, a party-in this case, fewer than six months after her campaign committee sent the letter using the threat of a “sneak attack” by attorneys such as Mr. Fieger as a fund-raising tool for her 2006 election campaign.
Regarding Chief Justice TAYLOR, it was reported that, during his 2000 campaign, he made statements at a fund-raiser about the cases that Mr. Fieger had pending in the appellate courts: “Geoffrey Fieger apparently has $90 million of lawsuit awards pending in the state Court of Appeals.”[19] The majority’s joint opinion asserts that “it shows no ‘bias or prejudice’ to identify the number of cases Mr. Fieger had on appeal....” Ante at 272. But then-Justice TAYLOR was not identifying the number of cases that Mr. Fieger had on appeal; he was emphasizing the amount of money that was at stake— $90 million — and implying that the awards would be overturned if then-Justice TAYLOR were retained in office.
Justice YOUNG, in a speech at the Republican Party state convention in August 26,2000, said that “Geoffrey Fieger, and his trial lawyer cohorts hate this court. There’s honor in that.”[20]
Yet another display of bias occurred in a campaign ad paid for by “Robert Young for Justice,” “Stephen Mark-man for Justice,” and “Clifford Taylor for Justice.” The campaign ad included the following language:
*336 Opponents continue to attack Michigan’s Supreme Court, but now they’ve gone too far. The Detroit News calls the opponents’ ads truly vicious, saying the charges are false and silly. The Grand Rapids Press admonishes Detroit area trial lawyer Marietta Robinson’s smear campaign, writing “Robinson’s hard-edged campaign has been degrading to the court and to the public’s confidence in [the] Michigan judiciary.” Some people will do anything to get elected. No wonder Geoffrey Fieger, Jesse Jackson and the trial lawyers support Robinson, Fitzgerald and Thomas [who ran against Chief Justice Taylor and Justices Young and Markman in the 2000 Supreme Court election].[21]
By displaying bias and prejudice against an individual, attorney Geoffrey Fieger, during their judicial campaigns, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and Markman have disqualified themselves from hearing this case in which Mr. Fieger is a party.
B
In addition, Chief Justice TAYLOR and Justices CORRIGAN and MARKMAN have become so “enmeshed” in matters involving Mr. Fieger as to make it inappropriate for them to sit in a case in which Mr. Fieger is a party. See Johnson v Mississippi.[22]
In Johnson, Robert Johnson, a civil rights worker who was at the time a defendant in a criminal proceeding, allegedly disobeyed a trial judge’s instructions directing him where to walk in the courtroom. The trial judge had Johnson removed from the courtroom and instituted contempt proceedings against Johnson two years later. In the meantime, Johnson and others had *337 filed a successful suit in federal court to enjoin the state trial judge from conducting “trials of either Negroes or women ... until such time as Negroes and women were not systematically excluded from juries.”[23] The trial judge convicted Johnson of contempt and gave him a four-month sentence. The United States Supreme Court reversed the contempt conviction, holding that due process required that the contempt hearing take place before a different judge.[24] The Court stated that Johnson should have had a contempt hearing and that the trial judge should have recused himself from presiding over that hearing.[25] The Court explained that not only was there evidence that the trial judge had made “intemperate remarks . .. concerning civil rights litigants,” but
immediately prior to the adjudication of contempt [the trial judge] was a defendant in one of [Johnson’s] civil rights suits and a losing party at that. From that it is plain that he was so enmeshed in matters involving [Johnson] as to make it most appropriate for another judge to sit. Trial before “an unbiased judge” is essential to due process.[26]
Mr. Fieger has criticized Chief Justice Taylor’s and Justice CORRlGAN’s prior actions as Court of Appeals judges, and both justices have been involved in prior grievance actions relating to Mr. Fieger’s criticism of their actions. Therefore, both Chief Justice TAYLOR and Justice CORRIGAN are “so enmeshed” in matters involving Mr. Fieger that due process requires that they not participate in cases in which Mr. Fieger is a party.
In 1994, complaining about two then-recent Court of Appeals cases, Mr. Fieger publicly insulted Chief Justice *338 (then-Court of Appeals Judge) Clifford TAYLOR, calling him “amazingly stupid” and saying:
Cliff Taylor and [Court of Appeals Judge E. Thomas] Fitzgerald, you know, I don’t think they ever practiced law, I really don’t. I think they got a law degree and said it will be easy to get a — they get paid $120,000 a year, you know, and people vote on them, you know, when they come up for election and the only reason they keep getting elected [is] because they’re the only elected officials in the state who get to have an incumbent designation, so when you go into the voting booth and it says “Cliff Taylor”, it doesn’t say failed Republican nominee for Attorney General who never had a job in his life, whose wife is Governor Engler’s lawyer, who got appointed when he lost, it says “Cliff Taylor incumbent judge of the Court of Appeals,” and they vote for him even though they don’t know him. The guy could be Adolf Hitler and it says “incumbent judge” and he gets elected.
Mr. Fieger said more about Chief Justice (then-Court of Appeals Judge) TAYLOR:
[T]his guy has a political agenda .... I knew in advance what he was going to do .... We know his wife is Governor Engler’s Chief Counsel. We know his wife advises him on the law. We know — we knew — what he was going to do in advance, and guess what, he went right ahead and did it. Now you can know somebody’s political agenda affects their judicial thinking so much that you can predict in advance exactly what he’s going to do[,] ... his political agenda translating into his judicial decisions.
Although the Grievance Administrator charged Mr. Fieger with professional misconduct, on the basis of this statement and others, Mr. Fieger was never disciplined for these public slurs on then-Judge TAYLOR.[27]
*339 That Justice CORRIGAN is too enmeshed in matters involving Mr. Fieger is revealed by the fact that on March 25,1996, then-Judge CORRIGAN filed a request for an investigation of Mr. Fieger with the Attorney Grievance Administrator. This request for investigation was filed by then-Judge CORRIGAN in response to statements alleging a conspiracy between her and the Oakland County Prosecutor’s office to improperly influence the outcome of Jack Kevorkian’s criminal trial. That request for investigation was dismissed by the Attorney Grievance Commission in 2002.[28] This case involves the identical issue (criticism of an elected judge by Mr. Fieger) as the 1996 situation in which then-Judge CORRIGAN was both the judge being criticized and the complainant requesting an investigation.
These events support the conclusion that Chief Justice TAYLOR and Justice CORRIGAN have become so “enmeshed” in matters involving Mr. Fieger’s comments towards judges, the subject of this case before us, as to make it inappropriate and a violation of due process for them to sit in this case in which Mr. Fieger is a party.
Justice MARKMAN has also been so enmeshed in matters involving Mr. Fieger as to make it inappropriate for him to sit in a case in which Mr. Fieger is a party. In Johnson, immediately before the adjudication of a contempt charge, the trial judge was a defendant in one of plaintiff Johnson’s civil rights suits. Here, Justice *340 MARKMAN is currently a defendant in a federal suit by Mr. Fieger. Mr. Fieger has brought a 42 USC 1983 suit against Justice MARKMAN in the United States District Court for the Eastern District of Michigan, accusing Justice MARKMAN of being part of a conspiracy to violate Mr. Fieger’s civil rights. On January 4, 2006, Justice MARKMAN filed a motion seeking Rule ll[29] sanctions against the plaintiff, Mr. Fieger. Justice MARKMAN’s motion cites the “numerous motions to disqualify Defendant Markman ... from participating in appeals in which Plaintiff Fieger is a party or counsel” as supporting grounds for the Rule 11 sanctions.
While Justice MARKMAN did not instigate that suit, he did file the motion seeking Rule 11 sanctions, using as background the fact that Mr. Fieger had previously filed numerous “frivolous” motions against him. Given that fact, Justice MARKMAN has become so “enmeshed” in controversial affairs with Mr. Fieger that due process requires that he not participate in this case, in which Mr. Fieger is a party.
c
Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN may argue that they have no actual bias or prejudice against Mr. Fieger. But regardless of what their innermost feelings may be, their displays of bias and animosity toward Mr. Fieger, as demonstrated by the aforementioned examples, require them to recuse themselves. Actions speak louder than words, and a judge may be the last person to perceive actual bias against the party accusing the judge of bias. As the United States Supreme Court said in In re Murchison:[30]
*341 A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that “every procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.” Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally high between contending parties. But to perform its high function in the best way “justice must satisfy the appearance of justice.” [Citations omitted.]
This Court has previously recognized that “there may be situations in which the appearance of impropriety on the part of a judge or decisionmaker is so strong as to rise to the level of a due process violation.”[31] This is such a case.
Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN have recently attempted to rewrite how the rules of conduct that govern judges, including the justices of this Court, are applied by questioning and rejecting the application of the appearance of impropriety standard in Canon 2 of the Code of Judicial Conduct.[32] The joint opinion of the majority justices relies on a statement by Chief Justice TAYLOR and Justice MARKMAN in Adair for the proposition that
if a judge does that which the law and the standards of conduct permit, such action cannot ordinarily serve as the *342 basis for disqualification. To hold otherwise would be to make the law into a “snare” for those who are operating well within its boundaries. [Ante at 273.]
The justices of the majority miss the point. The question is not whether their actions were legal. The question is whether those actions display extreme antagonism toward and bias against a party in a case, or demonstrate that judges have become so “enmeshed” in matters involving a person as to make it a violation of due process for them to sit in a case in which that person is a party. Disqualification may be required for actions that are within the law when those legal actions violate a party’s rights to due process under the Fifth and the Fourteenth Amendment.
D
The broader issue concerning disqualification of justices has repeatedly presented itself in cases before this Court for more than three years. Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN inaccurately suggest in their joint opinion that my concern over this Court’s disqualification practices began “only after Mr. Fieger ceased targeting her with these motions.”[33] This speculation is untrue.
During this Court’s deliberations in In re JK, 468 Mich 202; 661 NW2d 216 (2003), a case involving termination of parental rights, my participation in the case became an issue and led me to research the procedures governing the participation and disqualification of justices.[34] Since that time, I have repeatedly *343 called for this Court to address the need for clear, fair disqualification procedures for justices.
In September 2003, I denied Mr. Fieger’s motion for my recusal in Gilbert v DaimlerChrysler Corp.[35] In requesting my recusal from that appeal, Mr. Fieger asserted only that the Michigan Chamber of Commerce, who had filed a brief as amicus curiae in Gilbert, had contributed to my campaign for reelection to the Michigan Supreme Court and had aired advertisements advocating my reelection. I included in the order denying the motion a detailed statement explaining my reasons for denying the motion.
I noted in my statement in Gilbert that my reelection campaign records showed that it had received a $200 contribution from Mr. Fieger.[36] This was a clerical error. Records from the Secretary of State show that Mr. Fieger contributed $400 to my reelection campaign committee. To the best of my knowledge, this is the only “support” that Mr. Fieger gave my campaign committee in the 2002 election, despite the concurring statement’s insinuations to the contrary, ante at 267.[37]
*344 For more than three years, since May 2003, I have called for this Court to recognize, publish for public comment, place on a public hearing agenda, and address the procedures concerning the participation or disqualification of justices in at least 11 published statements in cases.[38] Since that time, when a motion has been filed asking for my recusal from a particular case, I have given detailed reasons for my decision whether or not to recuse myself. For example, in Graves v Warner Bros, 469 Mich 853, 854 (2003), when I denied Mr. Fieger’s motion requesting my recusal, my statement explained that the motion did not assert any grounds for my recusal in that case:
Plaintiffs motion for recusal is based on the same grounds alleged in the April 16,2003 motion filed in Gilbert v DaimlerChrysler, Docket No. 122457 to recuse the same justices. But plaintiff recognizes that the allegations pertaining to the Michigan Chamber of Commerce participating as amicus curiae in Gilbert v DaimlerChrysler do not apply in this case.
*345 In requesting my recusal from the appeal in Gilbert v DaimlerChrysler, plaintiff asserted only that the Michigan Chamber of Commerce, which filed a brief as amicus in that case, contributed to my campaign for reelection to the Michigan Supreme Court in 2002 and aired advertisements advocating my reelection. There are no allegations in either Gilbert v DaimlerChrysler or this case that I made or caused to be published any statements about any of the parties, their attorneys, the amicus, or issues in the case that would raise the issue of bias or prejudice on my part.
The joint opinion’s suggestion, ante at 280 n 6, that I merely issued a conclusory statement denying the recusal motion in Graves is both inaccurate and misleading. Since I responded to these two motions for my recusal with detailed statements explaining my decisions not to recuse myself from these cases, Mr. Fieger has not moved for my recusal in any subsequent cases.
Currently, justices of the Michigan Supreme Court sometimes follow unwritten traditions when deciding a motion for disqualification. At other times, justices follow portions of the current court rule on disqualification, MCR 2.003.[39] Mr. Fieger filed three motions for *346 recusal of various justices in this case; the motions were decided by the individual justices, and there was no possibility of review of that justice’s individual decision not to recuse himself or herself.[40]
This helter-skelter approach of following “unwritten traditions” that are secret from the public is wrong. There should be clear, fair, orderly, and public procedures concerning the participation or disqualification of justices.
CONCLUSION
Had any one of the four justices in the majority— Chief Justice TAYLOR or Justice CORRIGAN, Justice YOUNG, or Justice MARKMAN — recused himself or herself from participating in the case, the Attorney Discipline Board’s decision to dismiss the charges against Mr. Fieger would have been affirmed by equal division. MCR 7.316(C).[41]
*347 Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN have displayed extreme antagonism toward and bias against the respondent, Mr. Fieger, by statements made in their respective judicial campaigns; Chief Justice TAYLOR and Justices CORRIGAN and MARKMAN have become so “enmeshed” in matters involving Mr. Fieger as to make it inappropriate for them to sit in a case in which Mr. Fieger is himself a party. Accordingly, the participation of Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN in this case violates Mr. Fieger’s rights to due process under the Fifth and the Fourteenth Amendment.
I declined to participate in the various motions requesting the disqualification of Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN when Mr. Fieger appeared as an attorney representing a party. In doing so, I stated that those motions and cases should not be decided until the Court published for public comment and public hearings and adopted clear, fair, orderly, and public procedures concerning the participation or disqualification of justices.[42] But now that this case is being decided, and Mr. Fieger is a party, rather than an attorney representing a party, I can no longer withhold my opinion that Chief Justice TAYLOR and Justices Corrigan, Young, and Markman should not be participating in the decision of this case.

 Republican Party of Minnesota v White, 536 US 765; 122 S Ct 2528; 153 L Ed 2d 694 (2002), suggests that if campaign statements display a bias for or against an individual, the statements could raise due process concerns for future litigants. See also State ex rel La Russa v Himes, 144 Fla 145; 197 So 762 (1940), holding that a judge’s campaign statements about a specific individual disqualified the judge from presiding over a subsequent trial of that person.

 Due process violations may arise where a judge has been so personally “enmeshed in matters” concerning one party that the judge is biased against the party. See Johnson v Mississippi, 403 US 212, 215; 91 S Ct 1778; 29 L Ed 2d 423 (1971) (judge had been “a defendant in one of petitioner’s civil rights suits and a losing party at that”).

 For example, the joint opinion of the majority justices is misleading when it states that this dissent is largely grounded in “statements that occurred between six and ten years ago.” Ante at 267. Less than 6 months ago, Justice Corrigan’s campaign committee mailed a fund-raising letter saying, “We cannot lower our guard should the Fiegers of the trial bar raise and spend large amounts of money in hopes of altering the election by an 11th hour sneak attack.” Less than 7 months ago, Justice Markman, who is currently a defendant in a federal lawsuit initiated by Mr. Fieger, filed a motion for sanctions under FR Civ P 11 against Mr. Fieger.
Further, the joint opinion of the majority justices inaccurately says that my concern over this Court’s disqualification procedures began “only after Mr. Fieger ceased targeting her with these motions.” Ante at 280. As I explain in part D of this opinion, since May 2003 I have consistently called for this Court to address the need for clear, fair disqualification procedures for justices, including in two cases in which Mr. Fieger had requested that I recuse myself.

 To paraphrase Shakespeare, it seems the majority “doth protest too much.” Hamlet, act 3, sc 2.

5 Talbert v Muskegon Constr Co, 305 Mich 345, 348; 9 NW2d 572 (1943).

 Johnson, supra at 215-216 (judge violated due process by sitting in a case in which one of the parties was previously a successful litigant against him); Tumey v Ohio, 273 US 510, 532; 47 S Ct 437; 71 L Ed 749 (1927) (judge violated due process by sitting in a case in which it would be in his financial interest to find against one of the parties); Crompton v Dep’t of State, 395 Mich 347, 351; 235 NW2d 352 (1975) (“A hearing before an unbiased and impartial decisionmaker is a basic requirement of due process.”).

 Johnson, supra at 215; Mayberry v Pennsylvania, 400 US 455, 466; 91 S Ct 499; 27 L Ed 2d 532 (1971). See also Tumey v Ohio, supra at 532 (“Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, deifies the latter due process of law.”).
The United States Supreme Court has since extended this principle to civil cases. Aetna Life Ins Co v Lavoie, 475 US 813, 825; 106 S Ct 1580; 89 L Ed 2d 823 (1986). See also Ponder v Davis, 233 NC 699, 704; 65 SE2d 356 (1951) (“A fair jury in jury cases and an impartial judge in all cases are prime requisites of due process.”).

 Tumey v Ohio, supra at 532.

 See id.

 Id. at 523, 531-534; Aetna Life Ins Co v Lavoie, supra at 822-825; Ward v Village of Monroeville, 409 US 57, 58-62; 93 S Ct 80; 34 L Ed 2d *332 267 (1972); Johnson, supra at 215-216; In re Murchison, 349 US 133, 137-139; 75 S Ct 623; 99 L Ed 942 (1955).

 Republican Party of Minnesota v White, supra at 775 (emphasis in original).

 Id. at 776.

 Id.

14 Id. (emphasis in original).

 State ex rel La Russa v Himes, 144 Fla 145; 197 So 762 (1940).

 Id. at 146.

17 Id. at 147.

 The letter was one of the grounds listed in Mr. Fieger’s April 20, 2006, motion for disqualification requesting that Justice Corrigan recuse herself from this case. That motion was denied. Grievance Administrator v Fieger, 475 Mich 1211 (2006).

 Justice Visits County, The Sunday Independent, September 3, 2000, p 3. This statement was one of the grounds listed in Mr. Fieger’s December 17, 2004, motion for disqualification requesting the recusal of Chief Justice Taylok from this case. That motion was denied. Grievance Administrator v Fieger, 472 Mich 1244 (2005).

 This statement was one of the grounds listed in Mr. Fieger’s December 17, 2004, motion for disqualification requesting that Justice Young recuse himself from this case. That motion was denied. Id.

21 This statement was one of the grounds listed in Mr. Fieger’s December 17, 2004, motion for disqualification requesting that Chief Justice Taylok and Justices Young and Markman recuse themselves from this case. That motion was denied. Id.

 403 US 212, 215; 91 S Ct 1778; 29 L Ed 2d 423 (1971).

 Id. at 214.

 Id. at 215-216.

 Id. at 215.

26 Id. at 215-216 (citation omitted).

 The Attorney Discipline Board dismissed the charge involving these remarks about Chief Justice Taylor. The Grievance Administrator appealed the matter to this Court; this Court remanded the matter to the *339 Attorney Discipline Board for reconsideration in light of In re Chmura, 461 Mich 517; 608 NW2d 31 (2000). Grievance Administrator v Fieger, 462 Mich 1210 (2000). Chief Justice Taylor did not participate in that decision.

 This request for investigation was one of the grounds hsted in Mr. Fieger’s December 17, 2004, motion for disqualification requesting the recusal of Justice Corrigan from this case. That motion was denied. Grievance Administrator v Fieger, 472 Mich 1244 (2005).

 FR Civ P 11.

 349 US 133, 136; 75 S Ct 623; 99 L Ed 942 (1955).

 Cain v Dep’t of Corrections, 451 Mich 470, 513 n 48; 548 NW2d 210 (1996).

 See Adair v Michigan, 474 Mich 1027 (2006).

 Ante at 280.

 For an explanation of this history, see my statement of nonparticipation in In re JK, supra at 219.

 469 Mich 883 (2003).

 My statement in Gilbert, supra at 884, noted that my reelection campaign had received contributions from both sides in that case. Besides the contribution from the plaintiffs counsel, Mr. Fieger, I listed contributions from the defendant and the defendant’s attorneys: $2,000 from DaimlerChrysler’s political action committee; $250 from DaimlerChrysler’s assistant general counsel, Steven Hantler; $375 each from DaimlerChrysler’s attorneys Elizabeth Hardy and Thomas Kienbaum; and $500 from retired Justice Patricia Boyle, of counsel for DaimlerChrysler in that case. Those amounts were correct.

 As I said in that statement three years ago, Michigan’s current system of selecting Supreme Court justices, which combines statewide elections and appointments by the Governor to fill vacancies, needs to be examined. I have developed and am promoting plans for an alternative selection system for Michigan Supreme Court justices, still retaining elections, but for one term only. The joint opinion’s discussion of the *344 problems with the expensive, rancorous, statewide elections, ante at 276-277, underscores this need.

 See, e.g., In re JK, supra at 220-221, Graves v Warner Bros, 469 Mich 853 (2003), Graves v Warner Bros, 469 Mich 853, 854-855 (2003), Gilbert v DaimlerChrysler Corp, 469 Mich 883, 889 (2003), Advocacy Org for Patients & Providers v Auto Club Ins Ass’n, 472 Mich 91, 96; 693 NW2d 358 (2005), Harter v Grand Aerie Fraternal Order of Eagles, 693 NW2d 381 (2005), Grievance Administrator v Fieger, 472 Mich 1244, 1245 (2005), Scalise v Boy Scouts of America, 473 Mich 853 (2005), McDowell v Detroit, 474 Mich 999, 1000 (2006), Stamplis v St John Health Sys, 474 Mich 1017 (2006), Heihkila v North Star Trucking, Inc, 474 Mich 1080, 1081 (2006), and Lewis v St John Hosp, 474 Mich 1089 (2006).
Since May 2003, there have been nine public hearings on other administrative matters in which the rules governing the disqualification of justices could have been addressed: September 23, 2003, January 29, 2004, May 27,2004, September 15,2004, January 27,2005, May 26,2005, September 29, 2005, January 25, 2006, and May 24, 2006.

 There has been inconsistency by some justices regarding the applicability of MCR 2.003 to Supreme Court justices. At times they have applied the rule to themselves, and at times they have not. Indeed, Chief Justice Taylor and Justices Corrigan and Markman have each at times availed themselves of MCR 2.003. In Adair v Michigan, 474 Mich 1027, 1043 (2006), Chief Justice Taylor and Justice Markman specifically recognized that they were required to comply with MCR 2.003, stating that “[p]ursuant to MCR 2.003(B)(6), we would each disqualify ourselves if our respective spouses were participating as lawyers in this case, or if any of the other requirements of this court rule were not satisfied.” [Emphasis added.] Justice Young concurred in their statement, saying that he supported their joint statement and fully concurred in the legal analysis of the ethical questions presented in it. Id. at 1053. Similarly, for Grosse Pointe Park v Michigan Muni Liability & Prop Pool, 473 Mich 188; 702 NW2d 106 (2005), Justice Corrigan used the remittal of disqualification process of MCR 2.003(D).
*346 But at other times, these four justices have not followed the provisions of MCR 2.003. For example, in Gilbert v DaimlerChrysler Corp, 469 Mich 883, 889 (2003), then-Chief Justice Corrigan and Justices Taylor, Young, and Markman denied a motion for reconsideration of the Court’s order denying the motion for disqualification and did not refer the motion to the State Court Administrator for the motion to be assigned to another judge for review de novo, as would be proper under MCR 2.003(C)(3).

 Although MCR 2.003(C)(3) gives a party the right to have a judge’s decision not to recuse himself or herself reviewed (by the chief judge or a judge assigned by the State Court Administrator), when Mr. Fieger asked for reconsideration of then-Chief Justice Corrigan’s and Justices Taylor’s, Young’s, and Markman’s decisions not to recuse themselves in Gilbert, those four justices simply denied the motion themselves and did not refer the motion to another judge for review de novo.

 MCR 7.316(C) provides in pertinent part: “Except for affirmance of action by a lower court or tribunal by even division of the justices, a decision of the Supreme Court must be made by concurrence of a majority of the justices voting.”

 See, e.g., Graves v Warner Bros, 469 Mich 853, 854-855 (2003), Gilbert v DaimlerChrysler Corp, 469 Mich 883 (2003), Harter v Grand Aerie Fraternal Order of Eagles, 693 NW2d 381, 382 (2005), McDowell v Detroit, 474 Mich 999, 1000 (2006), Stamplis v St John Health Sys, 474 Mich 1017 (2006), Heikkila v North Star Trucking, Inc, 474 Mich 1080, 1081 (2006), and Lewis v St John Hosp, 474 Mich 1089 (2006).