ZAHRA, J.
(dissenting). I respectfully dissent from the majority’s conclusion that the language in Michigan State University (MSU) Ordinance, § 15.05 that makes it an offense to “disrupt the normal activity” of a protected person is unconstitutional under City of Houston, Texas v Hill.[1] Significantly, the issue of whether the ordinance was unconstitutionally applied *87 to defendant for engaging in protected expression is not before this Court. Addressing defendant’s facial challenge, the majority concludes that the overbreadth of the ordinance is so substantial that it must be struck down. The decision to strike down the instant ordinance, and thereby nullify a decision of the university’s legislative body, is a matter of considerable consequence. This Court is responsible for upholding both the Michigan and federal constitutions, but its authority to invalidate laws is limited and must be predicated on a clear and apparent demonstration of unconstitutionality. Absent that demonstration, the majority’s decision, in my judgment, is an expansion of judicial power and an unwarranted encroachment on the legislative branch of government.
In my view, Hill does not provide sufficient grounds to conclude that MSU Ordinance, § 15.05 reaches a substantial amount of constitutionally protected expression relative to its plainly legitimate sweep. I am also not convinced that the ordinance presents a realistic danger of significantly compromising First Amendment freedoms. Finally, the majority fails to consider the context of the academic environment in reaching its decision. I would affirm the judgment of the Court of Appeals upholding MSU Ordinance, § 15.05 as constitutional on its face and remanding the case to the trial court for consideration of defendant’s as-applied challenge.[2]
I. THE OVERBREADTH DOCTRINE
Laws are presumed constitutional, and this Court *88 must construe a law as constitutional unless its unconstitutionality is clearly apparent.[3] The burden of proving that a law is unconstitutional falls on the party bringing the challenge.[4]
Facial overbreadth, as alleged here, is a unique breed of constitutional challenge because of the competing social costs at issue.[5] The first concern is that the threat of enforcement of an overbroad law may have a chilling effect on protected expression, which is harmful because it deprives society of an uninhibited marketplace of ideas.[6] The fear is that the law’s “very existence may cause others not before the court to refrain from constitutionally protected speech or expression.”[7] To address this concern, the overbreadth doctrine allows parties to challenge laws without establishing the traditional standing requirements.[8] That is, it “allows a party to challenge a law written so broadly that it may inhibit the constitutionally protected speech of third parties, even though the party’s own conduct may be unprotected.”[9] Accordingly, “[t]he overbreadth doctrine is an exception to the traditional rule of practice that ‘a *89 person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the court.’ ”[10]
“The consequence of our departure from traditional rules of standing in the First Amendment area is that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.”[11] The competing social cost of the overbreadth doctrine, therefore, is that it prevents a law from applying to constitutionally unprotected speech and even constitutionally unprotected conduct, which can result in obvious harm to society.[12] Accordingly, “[i]n order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute’s overbreadth be substantial, not only in an absolute sense, but also relative to the statute’s plainly legitimate sweep.”[13] Further, to invalidate a law, “there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court. . . .”[14] Invalidation for overbreadth is “strong medicine” that should be used “sparingly and only as a last resort” and not “when a limiting construction has been or could be placed on the challenged statute.”[15]
*90 II. DEFENDANT FAILS TO DEMONSTRATE THAT THE ORDINANCE REACHES A SUBSTANTIAL AMOUNT OF PROTECTED EXPRESSION
In Hill, the Court struck down as facially overbroad a Houston ordinance making it “ ‘unlawful for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty, or any person summoned to aid in making an arrest.’ ”[16] In contrast, MSU Ordinance, § 15.05 states, “No person shall disrupt the normal activity or molest the property of any person, firm, or agency while that person, firm, or agency is carrying out service, activity or agreement for or with the University.”[17] In my view, the text of the Houston ordinance and the Supreme Court’s stated reasons for striking it down are sufficiently distinguishable from this case that Hill, the sole basis for defendant’s challenge, does not support the majority’s conclusion that MSU Ordinance, § 15.05 reaches a substantial amount of protected expression.
The majority’s use of Hill to guide its analysis is problematic in the first instance because it effectively turns the presumption of constitutionality on its head. Although the majority states that it “presumes that ordinances are constitutional,”[18] its analysis uses a case in which an ordinance was declared unconstitutional as a point of reference and from there reasons that no basis exists for not treating that case as controlling. The majority’s analysis suggests a presumption of unconstitutionality. The majority’s reliance on Hill is also problematic because it allows the majority to evade a traditional overbreadth analysis in what amounts to an attempt to fit *91 a square peg into a round hole. Careful review reveals that the majority’s analysis presents an oversimplified version of Hill that downplays its distinguishing aspects, creating only the appearance of a good fit.
Beginning with the most obvious distinction, the Houston ordinance made it unlawful to “interrupt” a police officer in the execution of his or her duties, whereas MSU Ordinance, § 15.05 makes it unlawful to “disrupt” the normal activity of a protected person carrying out an activity for or with MSU. Contrary to the majority’s assertion, these terms are not used in a largely synonymous fashion by those who use the English language carefully, as judges must, and the majority’s use of thesaurus references is misleading.[19] The term “interrupt” is defined as “[t]o break the continuity or uniformity of,” whereas “disrupt” means “[t]o throw into confusion or disorder” or “[t]o interrupt or impede the progress, movement, or procedure of[.]”[20]
Significantly, the term “interrupt” typically carries a verbal connotation.[21] By contrast, the term “disrupt” carries a comparatively strong connotation that suggests not merely a verbal interjection or expression of a viewpoint, but an actual and severe impediment to the carrying out of one’s activities.[22] For example, in the *92 context of a meeting, whereas a meeting may proceed once an interruption is over, a disruption will likely end the meeting. In my view, as this example illustrates, disruptions most often result from a nonexpressive, physical disturbance rather than the verbal interjection of a viewpoint.[23] This is not to say that it is impossible for a person to disrupt the normal activity of a protected person through words or expressive conduct. Nevertheless, “the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.”[24]
The majority, however, construes the term “disrupt” as synonymous with “interrupt,” relying primarily on its second dictionary definition, which is “[t]o interrupt or impede the progress, movement, or procedure of[.]” Using this definition, the majority concludes that MSU Ordinance, § 15.05 is comparable to the Houston ordinance because “a person can ‘disrupt’ another person by . . . interrupting that person . . . ,”[25]
The majority’s synthesis is not faithful to the language in the dictionary definition of “disrupt” or to MSU Ordinance, § 15.05. The second dictionary definition of “disrupt” is to interrupt the progress, interrupt the movement, or interrupt the procedure of. And MSU Ordinance, § 15.05 provides that “[n]o person shall *93 disrupt the normal activity ... of [a protected person].”[26] Thus, the ordinance language is focused not on disrupting the person, but on disrupting the normal activity in which the person is engaged. The following statement is a more accurate synthesis of the second dictionary definition of “disrupt” and MSU Ordinance, § 15.05: No person shall interrupt the progress, the movement, or the procedure of the normal activity of a protected person.
Interrupting the progress, the movement, or the procedure of a normal activity is a far cry from interrupting a person, and this difference indicates that MSU Ordinance, § 15.05 is less concerned with silencing speech and more concerned with allowing legitimate activities on campus to go unimpeded. The scope of the ordinance is further limited because a protected person’s “normal activity” may include being verbally interrupted by other people. It is part of a professor’s normal activity, for example, to be interrupted by students asking questions. It is likewise part of a police officer’s or a parking enforcement officer’s normal activity to be interrupted by having to respond to legitimate questions from the public. MSU Ordinance, § 15.05 does not prohibit these interruptions. The majority, having relied primarily on the second dictionary definition of “disrupt,” fails to discuss any of these subtleties or engage in any balancing analysis that takes into consideration the legitimate sweep of MSU Ordinance, § 15.05.
Applying the first dictionary definition of “disrupt,” another way to violate the ordinance is to throw into confusion or disorder the normal activity of a protected person. Certainly, a person can interrupt without throwing into confusion or disorder the normal activity *94 of a protected person — for instance, by asking a question.[27] Accordingly, while all disruptions may be considered interruptions (as suggested by the inclusion of “interrupt” in the second dictionary definition of “disrupt”), not all interruptions rise to the level of disruptions.[28] It is also no mistake that the term “disrupt” is not included in the dictionary definition of “interrupt,” as one would expect if the terms were truly synonymous. Accordingly, the term “disrupt” carries a different meaning than “interrupt.”
Nonetheless, according to the majority, disruptions that throw into confusion or disorder the normal activity of a protected person also implicate purely expressive conduct and, therefore, MSU Ordinance, § 15.05 reaches a substantial amount of protected expression under either dictionary definition of “disrupt.” As an example, the majority asserts that “if a person asks another person several questions, which causes that other person’s activity to be ‘thrown into confusion or disorder,’ a prohibited disruption has occurred.”[29] The Court in Hill, however, addressed the majority’s hypothetical example and concluded that a municipality may constitutionally punish such conduct. Specifically, the Court agreed with Justice Powell that “ ‘a municipality constitutionally may punish an individual who chooses to stand near a police officer and persistently attempt to engage the officer in conversation while the officer is directing traffic at a busy intersection.’ ”[30] Stated dif *95 ferently, the interruption, expressive or otherwise, is not protected if it prevents the officer from directing traffic at a busy intersection. The Court explained, however, that a municipality may not do what Houston did, which was “to attempt to punish such conduct. .. by authorizing the police to arrest a person who in any manner verbally interrupts an officer.”[31] MSU Ordinance, § 15.05, however, does not make it unlawful to in any manner disrupt a protected person. Rather, a disruption is prohibited only if it prevents a protected person from carrying out an activity for or with MSU, making it narrower than the Houston ordinance.
The linguistic differences between the ordinances reveal the logical fallacy employed by the majority. In essence, the majority reasons that, because the Supreme Court held that the term “interrupt” in the Houston ordinance reached a substantial amount of protected expression, and because some interruptions rise to the level of disruptions, then the term “disrupt” in the MSU ordinance also reaches a substantial amount of protected expression. This is a non sequitur — the conclusion does not follow from the premises. Rather, all that can he drawn from Hill is that MSU Ordinance, § 15.05 reaches less protected expression than the Houston ordinance.[32] This, of course, falls short of defendant’s burden to establish substantial overbreadth, and it leaves this Court with insufficient grounds to invalidate the ordinance.
Furthermore, the majority effectively ignores a major facet of the Court’s rationale in Hill for striking down *96 the Houston ordinance. The Court interpreted the Houston ordinance as targeting speech and not core criminal conduct in large part because the Texas Penal Code preempted governmental subdivisions or agencies from enacting or enforcing laws that purported to criminalize any form of physical assault against a police officer, and the city conceded the issue of preemption in the Supreme Court.[33] The Court stated that, as preempted, “the enforceable portion of the ordinance deals not with core criminal conduct, but with speech.”[34] The Court also stated that “[t]he enforceable portion of this ordinance is a general prohibition of speech that ‘simply has no core’ of constitutionally unprotected expression to which it might be limited.”[35] Indeed, given the extent of preemption, the Court went as far as to say that “limiting the ordinance to ‘physical acts’ would be equivalent to invalidating it on its face.”[36] Thus, the Court construed the enforceable portion of the ordinance as prohibiting only “verbal interruptions of police officers.”[37] To the extent that the ordinance prohibited nonverbal interruptions or other physical affronts directed toward police officers, the ordinance was preempted.[38]
*97 Given this limited construction, the Court sensibly concluded that the Houston ordinance criminalized a substantial amount of protected expression relative to its plainly legitimate sweep. In this case, however, neither defendant nor the majority identifies a Michigan law that preempts MSU Ordinance, § 15.05. Accordingly, it is enforceable against physical disruptions. Because the enforceability of the ordinance is not limited to mere verbal disruptions, it has a far broader legitimate sweep than the Houston ordinance.[39]
The majority asserts that because existing laws “already criminalize any physical assault that disrupts someone on the MSU campus . .. , the partial preemption of the Hill ordinance does not compel a different result in this case.”[40] The majority’s statement misses the point. It did not matter in Hill that Texas law already criminalized physical assaults on police officers; *98 it mattered that the Texas Legislature had preempted the city from doing the same. Absent a similar preemption statute, the mere existence of MSU ordinances and statutes criminalizing certain campus disruptions does not align this case with Hill.
For all these reasons, Hill, the sole basis for defendant’s facial challenge, does not support the majority’s conclusion that MSU Ordinance, § 15.05 reaches a substantial amount of constitutionally protected expression.
III. DEFENDANT FAILS TO DEMONSTRATE A REALISTIC DANGER THAT THE ORDINANCE WILL SIGNIFICANTLY COMPROMISE FIRST AMENDMENT FREEDOMS
In addition to examining the language of an ordinance, it is appropriate to examine the likelihood of the ordinance’s unconstitutional application. Even in a facial overbreadth challenge, the party bringing the challenge must demonstrate “a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court... .”[41] In Hill, the appellee introduced city records indicating the frequency with which arrests had been made under the Houston ordinance and the types of exchanges that had led to those arrests.[42] The United States Court of Appeals for the Fifth Circuit reasoned that the evidence provided by the appellee showed a realistic danger that the city’s application of the ordinance significantly compromised protected expression, and the Supreme Court did not disturb that conclusion.[43] The Supreme Court further observed that the ordinance was “admittedly violated scores of times daily . . . .”[44]
*99 In this case, however, defendant provides no examples of protected expression that the ordinance has or could prohibit, and his characterization of the behavior for which he was cited as merely asking a parking official for his name is inconsistent with a fair reading of the record.[45] In particular, there is evidence that defendant drove toward the parking official in his vehicle at an aggressive speed, leapt out of his vehicle, approached the official in an aggressive manner, took pictures of the official with his cell phone, yelled at the official regarding the ticket, and demanded to know the official’s name. In response, and out of concern for what defendant might do next, the official returned to the inside of his truck and summoned the university police for assistance. Although I do not opine on defendant’s as-applied challenge, the record viewed as a whole belies defendant’s claim that he received a citation merely for interrupting a parking official to ask for his name. Defendant has also otherwise failed to show a history of enforcement of the ordinance against protected expression. Finally, unlike in Hill, no one has admitted that the ordinance at issue in this case is violated scores of times daily by persons engaging in protected expression.[46] Thus, I do not believe that defendant has dem *100 onstrated a realistic danger that MSU Ordinance, § 15.05 will significantly compromise First Amendment freedoms.
An ordinance’s enforcement mechanism may also be relevant to whether the ordinance presents a realistic danger of significantly compromising protected expression, as the Court suggested in Hill. The Houston ordinance prohibited interrupting police officers, the same class of individuals with the discretionary power to arrest individuals under the ordinance. As the Court explained, “[t]he freedom of individuals verbally to oppose or challenge police action without hereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.”[47] The Court also stated that it has “repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them.”[48] Thus, the Court considered it especially concerning that enforcement of the Houston ordinance was entrusted to the sole objects of its prohibition. This feature of the ordinance presented an “ ‘opportunity for abuse’ ” that the Court had previously admonished *101 legislators to avoid[49] and made the ordinance “susceptible of regular application to protected expression.”[50]
In this case, because the persons protected against disruptions are not limited to the police, there are many circumstances, including this case, under which enforcement of the ordinance is carried out by a neutral third party rather than left to the unfettered discretion of the object of the prohibition. Therefore, even if I were to assume that MSU Ordinance, § 15.05 reaches a substantial amount of protected expression, which I do not, it presents a reduced opportunity for abuse and is less susceptible of regular application to protected expression than the Houston ordinance.[51]
IV CONSIDERATIONS OF THE ACADEMIC ENVIRONMENT
It is apparently of little consequence to the majority that this case concerns an ordinance adopted by an institution of higher education. To the extent that an academic environment is at issue in this ordinance, it is far more likely that speech-related activities (both inside and outside the classroom) will be the object of disruptions than that such activities will be undermined by the prohibition against disruptions. In this *102 way, the ordinance as written may actually serve to promote the dissemination of ideas rather than threaten them.
Further, just as picketing outside courthouses[52] disruptive rallies within libraries,[53] and speech that disrupts the workplace[54] can be constitutionally prohibited, a university can implement measures to prevent disruptions of the academic environment.[55] Even campus newspapers are not entitled to the same degree of *103 free speech as the Lansing State Journal because of the particular mission of the university.[56] By striking down MSU Ordinance, § 15.05, the majority is not only compromising the ability of parking officials to safely respond to irate behavior, but it is also preventing MSU from regulating numerous other disruptive activities that interfere with its core academic mission.
Finally, it is useful to consider the campus disruptions that MSU Ordinance, § 15.05 will no longer cover because it has been partially struck down by the majority: (1) a person running onto the field of a stadium during a sporting event, (2) a person blaring music during a lecture, (3) a person interfering with the progress or movement of an individual cleaning or maintaining a university building, (4) a person prevent *104 ing the entrance of students into a classroom by physically blocking the classroom door, (5) a person shining a laser pointer during a performance or lecture, (6) a person turning the lights on and off in a classroom during an exam, (7) a person continually making noise in the library, (8) a person calling in a false bomb threat, and (9) a person pulling a fire alarm in the absence of a fire emergency. These are just a few of the countless nonexpressive campus occurrences that might throw into confusion or disorder the normal activity of a protected person. These illustrations highlight the tangible consequences of the majority’s decision.[57]
V CONCLUSION
For the foregoing reasons, I conclude that Hill provides insufficient grounds for this Court to invalidate MSU Ordinance, § 15.05. At best, Hill supports the conclusion that the ordinance reaches less protected expression and presents less danger of compromising First Amendment freedoms than the Houston ordinance. I also consider it significant that this ordinance *105 was adopted by an academic institution. Because Hill provides the sole basis for defendant’s overbreadth challenge, I do not believe that defendant has met his burden in this case. Accordingly, I dissent from the majority opinion and would instead affirm the judgment of the Court of Appeals, which upheld MSU Ordinance, § 15.05 as constitutional on its face and remanded the case to the circuit court for consideration of defendant’s as-applied challenge.
MARKMAN, J., concurred with ZAHRA, J.

 City of Houston, Texas v Hill, 482 US 451; 107 S Ct 2502; 96 L Ed 2d 398 (1987).

 Although my conclusion that defendant does not prevail in his constitutional challenge makes it unnecessary for me to reach the second question presented in this appeal, I nonetheless agree with the majority and the Court of Appeals that MCR 7.101(0) does not permit the assessment of costs in criminal matters.

 In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38, 490 Mich 295, 307; 806 NW2d 683 (2011); People v Barton, 253 Mich App 601, 603-604; 659 NW2d 654 (2002) (applying a presumption of constitutionality to an ordinance challenged on overbreadth grounds).

 In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71, 479 Mich 1, 11; 740 NW2d 444 (2007).

 United States v Williams, 553 US 285, 292-293; 128 S Ct 1830; 170 L Ed 2d 650 (2008).

 Virginia v Hicks, 539 US 113, 119; 123 S Ct 2191; 156 L Ed 2d 148 (2003).

 Broadrick v Oklahoma, 413 US 601, 612; 93 S Ct 2908; 37 L Ed 2d 830 (1973).

 Id. at 613.

 In re Chmura, 461 Mich 517, 530; 608 NW2d 31 (2000).

 Id., quoting Broadrick, 413 US at 610.

 Broadrick, 413 US at 613.

 Hicks, 539 US at 119.

 Williams, 553 US at 292.

 Los Angeles City Council v Taxpayers for Vincent, 466 US 789, 801; 104 S Ct 2118; 80 L Ed 2d 772 (1984).

 Broadrick, 413 US at 613.

 Hill, 482 US at 455, quoting Houston Ordinance, § 34-11(a) (1984) (emphasis added).

 Emphasis added.

 Ante at 72.

 A thesaurus groups related concepts and provides a list of terms having similar meanings. A particular term may be more or less appropriate than another term given the particular context in which the term is being used. A thesaurus does not supply a list of synonymous terms that should be used interchangeably as if they have identical meanings.

 The American Heritage Dictionary of the English Language (2006).

 See Merriam-Webster <http://www.merriam-webster.com/dictionary/ interrupt> (defining “interrupt” as “to stop or hinder by breaking in ” or “to break in upon an action; especially, to break in with questions or remarks while another is speaking”) (accessed July 26, 2012).

 The respective prefixes of “interrupt” and “disrupt” buttress this conclusion. The prefix “inter-” means between, reciprocal, or shared, *92 whereas “dis-” connotes opposite action, deprivation, or exclusion. See Merriam-Webster <http://www.merriam-webster.com/dictionary/inter-> (accessed July 26, 2012); Merriam-Webster <http://www.meriamwebster.com/dictionary/dis-> (accessed July 26, 2012).

 I am well aware that “the First Amendment protects more than just verbal speech.” Ante at 81 n 46. As the majority notes, it also protects expressive conduct. See, e.g., Tinker v Des Moines Indep Community Sch Dist, 393 US 503; 89 S Ct 733; 21 L Ed 2d 731 (1969). My position, however, is that disruptions are typically nonexpressive, making the majority’s discussion in footnote 46 of its opinion largely irrelevant.

 Los Angeles City Council, 466 US at 800.

 Ante at 80-81.

 Emphasis added.

 See People v Rapp, 293 Mich App 159, 165; 809 NW2d 665 (2011).

 Although I tend to agree that anytime someone “disrupts” he or she also “interrupts,” it does not follow, contrary to the majority’s conclusion, that anytime someone “interrupts” he also “disrupts.” In other words, one can interrupt without disrupting, hut one cannot disrupt without interrupting.

 Ante at 81.

 Hill, 482 US at 462 n 11 (citation omitted).

 Id. (emphasis altered).

 I find no relevance in the majority’s observation that MSU Ordinance, § 15.05 “protects a much broader class of individuals than the ordinance at issue in Hill,” ante at 76, because I do not believe that the prohibition against disrupting reaches a substantial amount of protected expression.

 Hill, 482 US at 460, 461 n 9. Given the city’s concession, the Court chose not to address whether the ordinance would be substantially overbroad if not preempted by the Texas Penal Code. Id.

 Id. at 460 (emphasis added).

 Id. at 468 (citation omitted).

 Id. at 469 n 18.

 Id. at 461 (emphasis added).

 Id. at 460-461. The Court noted that the Texas Penal Code broadly defined “assault” as including “any provocative contact with... any person,” making it much broader than the traditional concept of assault. Hill, 482 US at 460 n 8; Tex Penal Code Ann 22.01(a). Given that the Houston ordinance was preempted to the extent that it prohibited any provocative contact whatsoever, my reading of the enforceable portion of the ordinance as limited to verbal interruptions is not overly narrow Is not a physical interruption a form of provocative contact? Further, the *97 Court acknowledged that the Texas Penal Code did far more than preempt the enactment of laws criminalizing physical assaults. As one example, the Court noted that the Houston ordinance was preempted to the extent that it criminalized disorderly conduct. Hill, 482 US at 465 n 13; Tex Penal Code Ann 42.01. In any case, the majority concedes that the Court construed the Houston ordinance as unenforceable against many types of physical interruptions. By contrast, the Michigan Legislature has not barred local units of government from enforcing ordinances that bar provocative or assaultive contact. Thus, no part of the MSU ordinance is preempted. Therefore, the ordinance has a broader legitimate sweep than the Houston ordinance. The lack of preemption in this case is a significant distinction that the majority all but ignores.

 That MSU Ordinance, § 15.05 is not limited to verbal disruptions does not imply that the ordinance is somehow limited to nonverbal disruptions, and I disagree with the majority that the Court of Appeals implied that it is. Ante at 80 (asserting that “the Court of Appeals’ reasoning implies that... the term ‘disrupt’ is somehow limited to nonverbal acts”). I agree fully with the Court of Appeals’ statement that “while to ‘interrupt’ could be deemed, as it was in Hill, to reach a substantial amount of constitutionally protected conduct, the same can not necessarily be said of ‘disrupt.’ ” Rapp, 293 Mich App at 165.

 Ante at 84.

 Los Angeles City Council, 466 US at 801.

 Hill, 482 US at 455.

 Id. at 457.

 Id. at 466 (emphasis added).

 Because this is a facial challenge, defendant is not required to show that the ordinance is unconstitutional as applied to him. Nonetheless, he still must demonstrate that the ordinance presents a realistic danger of significantly compromising First Amendment freedoms.

 The majority asserts that “the MSU ordinance could be violated numerous times throughout any given day” because “there are seemingly infinite ways” to disrupt a protected person. Ante at 76-77 (emphasis added). That “there are seemingly infinite ways” to disrupt, however, provides all the more reason to be concerned about the damaging effects that the majority’s decision will have on legitimate law enforcement interests at MSU. By what alternative legal approach does the majority believe that MSU can address these “infinite” forms of disruptions other than by prohibiting “disruptions?” Moreover, the claim that the ordi *100 nance could be enforced frequently is beside the point if defendant has not demonstrated a likelihood that the ordinance will actually be enforced against protected expression and, as I believe, the prohibition against disruptions primarily regulates unprotected activity. There are several laws that are violated numerous times daily on MSU’s campus (e.g., laws prohibiting speeding and the possession of alcohol by a minor). The mere prevalence of violations does not make a law constitutionally suspect if the law does not reach a substantial amount of protected expression. Given the majority’s focus on the sheer number of violations as a barometer of unconstitutionality, does the majority understand the First Amendment as applying differently at a large campus such as MSU’s than at a smaller campus such as Northern Michigan University’s?

 Hill, 482 US at 462-463 (emphasis added).

 Id. at 465 (emphasis added).

 Id. at 466, quoting Lewis v New Orleans, 415 US 130, 136; 94 S Ct 970; 39 L Ed 2d 214 (1974) (Powell, J., concurring in the result).

 Hill, 482 US at 467.

 The majority’s claim that the concerns regarding the enforcement mechanism of the Houston ordinance “apply equally” here, ante at 78, is flawed. The majority fails to consider the broader legitimate sweep of MSU Ordinance, § 15.05, which protects more than the police. Further, the majority’s observation that the ordinance is “a criminal statute that subjects the violator to a misdemeanor conviction and provides someone who does have the power to arrest with the opportunity to do so,” ante at 78, only serves to state the obvious — the police are responsible for enforcing our criminal laws and, of course, even police officers are sometimes the victims of crimes.

 See Cameron v Johnson, 390 US 611, 617; 88 S Ct 1335; 20 L Ed 2d 182 (1968) (upholding a statute that prohibited picketing that “obstructs or unreasonably interferes with ingress or egress to or from the courthouse”).

 See Brown v Louisiana, 383 US 131, 142-143; 86 S Ct 719; 15 L Ed 2d 637 (1966) (suggesting that a state or its instrumentality may prohibit “disruption^] of library activities” in a reasonable and nondiscriminatory manner) (emphasis added).

 See Waters v Churchill, 511 US 661, 680-681; 114 S Ct 1878; 128 L Ed 2d 686 (1994) (explaining that speech by public employees that disrupts the workplace is unprotected, regardless of whether the speech is on a matter of public concern).

 See Tinker, 393 US at 513 (declaring that “conduct by the student, in class or out of it, which for any reason . .. materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech”) (emphasis added). Although Tinker involved high school students, courts have applied Tinker in the university setting. For example, in Salehpour v Univ of Tennessee, 159 F3d 199, 208 (CA 6, 1998), the United States Court of Appeals for the Sixth Circuit, citing Tinker, held that the plaintiffs disruption of the classroom environment at the university was unprotected. The court stated that
where the expression appears to have no intellectual content or even discernable purpose, and amounts to nothing more than expression of a personal proclivity designed to disrupt the educational process, such expression is not protected and does violence to the spirit and purpose of the First Amendment. Tinker, 393 U.S. at 511. The rights afforded to students to freely express their ideas and views without fear of administrative reprisal, must be balanced against the compelling interest of the academicians to educate in an environment that is free of purposeless distractions *103 and is conducive to teaching. Under the facts of this case, the balance clearly weighs in favor of the University. [Id. (emphasis added; citation omitted).]
Furthermore, the United States Supreme Court, in recognition of its decision in Tinker, stated that
[a] university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university’s mission is education, and decisions of this Court have never denied a university’s authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. [Widmar v Vincent, 454 US 263, 268 n 5; 102 S Ct 269; 70 L Ed 2d 440 (1981).]
In this case, MSU has implemented a reasonable, content-neutral regulation that is consistent with its mission as an educational institution. The regulation prohibits disruptions to the normal activity of persons carrying out a service, activity, or agreement for or with MSU.

 See Hazelwood Sch Dist v Kuhlmeier, 484 US 260, 273; 108 S Ct 562; 98 L Ed 2d 592 (1988) (“holding] that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns”).

 As another consequence, the majority’s decision may well invalidate several other campus prohibitions. MSU Ordinance, § 15.01 prohibits “any excessive noise or disturbance, riot, raid, or disruption ... which obstructs the free movement of persons about the campus or the free and normal use of University buildings and facilities, or prevents or obstructs the normal operations of the University” (emphasis added); MSU Ordinance, § 15.02 provides that “[n]o person shall disrupt the normal operation of any properly authorized class, laboratory, seminar, examination, field trip, or other education activity of the University” (emphasis added); and MSU Ordinance, § 15.03 provides that “[n]o person shall disrupt the normal use of any campus building or area which has been assigned or scheduled by appropriate means for educational or extracurricular activities” (emphasis added). These ordinances not only illustrate the range of laws that might be placed at risk by the majority in the very limited context of this one university, but also, each of these ordinances is relatively clear in communicating a sense that a “disruption” is distinct from a mere “interruption.”